679 F.2d 579
 28 Fair Empl.Prac.Cas. 1522,
28 Empl. Prac. Dec. P 32,678
Carl W. STOTTS, Individually and on behalf of all others
similarly situated, Plaintiffs-Appellees,
and
Fred L. Jones, Plaintiff-Appellee,
v.
MEMPHIS FIRE DEPARTMENT, Robert W. Walker, City of Memphis,
Joseph Sabatini, Defendants-Appellees,
D. L. Orders, W. R. Wilkinson, Jackie Parminter, Warner C.
Uselton, Jr., Jack Presgrove, Harold Wallace, Harvey
Jenkins, Fred E. Person, Jr., Preston Lee Dunn, Charley
Jones, John W. Blanton, for themselves and all other
non-minority employees of the Memphis Fire Department,
similarly situated, Proposed Intervenors-Appellants.
 No. 80-1469.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 15, 1981.
Decided May 7, 1982.
 
 Dan M. Norwood, Richardson, Norwood & Richardson, Memphis, Tenn., for appellants.
 Richard B. Fields, Clifford D. Pierce, Jr., City Atty., Edward R. Young, Louis P. Britt, III, for appellees.
 Before KEITH and MARTIN, Circuit Judges, and DUNCAN*, District Judge.
 KEITH, Circuit Judge.
 
 
 1
 On February 16, 1977, Plaintiff Carl Stotts filed a class action alleging that the hiring and promotion policies of the Memphis Fire Department were racially discriminatory. After three years of internecine discovery and over four months of intense negotiations, a consent decree settled the action. The decree was preliminarily approved and subsequently posted for comment on April 25, 1980. Neither class members nor the Firefighters Union, the union representative of Memphis firemen, filed objections to the decree. However, two weeks after the court preliminarily approved the decree, eleven non-minority firemen filed a motion to intervene alleging that the decree operated as reverse discrimination against non-minority firemen. After affording the proposed intervenors a hearing, the court rejected the alternative remedial action proffered by the intervenors and ruled that the decree was reasonable. The motion to intervene was denied on the ground that it was untimely. The proposed intervenors appeal. We affirm.
 
 FACTS
 
 2
 On February 16, 1977, Plaintiff Carl Stotts ("Plaintiff") filed a class action against the City of Memphis, the Memphis Fire Department, and the Director of Fire Services for the City of Memphis ("City") alleging that the hiring and promotion policies of the First Department were racially discriminatory. During the 18 months following the filing of the complaint, two articles appeared in the Memphis Press-Scimitar which described the Stotts case as an attack on the allegedly racially discriminatory hiring and promotion practices of the Memphis Fire Department. One of the articles was a front page story which reported that discovery in the Stotts case revealed that non-minority firemen had been given "cheat sheets" prior to certain Fire Department promotion examinations.
 
 
 3
 On December 4, 1979, Plaintiff sought and obtained a temporary restraining order ("TRO") enjoining the City from making 19 scheduled promotions in the Fire Prevention Bureau. Plaintiff alleged that minorities would be irreparably harmed if the promotions occurred. The promotions would prevent minorities from acquiring the experience necessary to qualify for supervisory positions. The City opposed the motion, arguing that the promotions were necessary for the efficient operation of the Fire Department. The City rejected the idea of creating "acting" or "temporary" positions and stated adamantly, "We do need to make the promotions." The court granted the motion for the TRO after finding that "there would be irreparable harm if promotions were granted that were not consistent with the rights of plaintiff." On December 5, a front page article in the Memphis Press-Scimitar described the effect the TRO would have on the Fire Department.
 
 
 4
 On January 17, 1980, the City appeared before the court and stated that settlement negotiations were continuing. The parties were not able to agree on the terms of a consent decree for several months. Finally, on April 25, 1980, the parties presented the court with a consent decree ("1980 Decree") which embodied an affirmative action plan. The 1980 Decree contained a minority hiring goal of 50% and a minority promotion goal of 20%. The court preliminarily approved the 1980 Decree and posted it in the fire stations for comment.
 
 
 5
 Neither the members of the plaintiff class nor the predominantly non-minority Firefighters Local Union 1784 filed an objection to the 1980 Decree. However, on May 12, 1980, eleven non-minority firemen filed a motion to intervene as representatives of all non-minority Fire Department employees. Allegedly, the posting of the decree in the fire stations was the first occasion the proposed intervenors knew that the Stotts case "may be decided against their interests unnecessarily." The proposed intervenors alleged that the decree's minority promotional goal caused them to be "victims of reverse discrimination." The proposed intervenors also alleged:
 
 
 6
 "There were less burdensome alternatives for relief for minority employees while not shifting discrimination to non-minority employees, i.e., creation of additional positions for promotion, organizational restructuring of the Memphis Fire Department, and/or constructive or front-pay or monetary damages to innocent employees who are adversely affected."
 
 
 7
 On May 16, 1980, the district court conducted a hearing to consider the motion to intervene. At the hearing, the proposed intervenors indicated that the only immediate relief they sought was a delay in the approval of the promotion section of the decree. Allegedly, additional discovery and expert analysis were necessary before concrete alternative remedies for the City's past discrimination could be presented. These alternative remedies would shift the burden of remedying past discrimination from incumbent non-minority employees to the "wrongdoer", the City.
 
 
 8
 The court also found that the proposed intervenors had adopted a "wait-and-see" posture with respect to the litigation and ruled that the motion to intervene was untimely. The court subsequently rejected the alternatives proffered by the proposed intervenors and ruled that the 1980 Decree was reasonable. The 1980 Decree was intended to parallel and supplement a consent decree entered in 1974 ("1974 Decree"). The 1980 Decree was similar to the 1974 Decree except that it contained specific hiring and promotion goals. The 1974 Decree did, however, contemplate the imposition of hiring and promotion goals if the City's efforts to remedy the effects of its discriminatory employment practices were unsuccessful.
 
 TIMELINESS OF MOTION TO INTERVENE
 
 9
 The eleven proposed intervenors sought permissive as well as intervention of right pursuant to Federal Rules of Civil Procedure 24(a) and (b). Rule 24, in pertinent part, provides:(a) INTERVENTION OF RIGHT.
 
 
 10
 Upon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 
 
 11
 (b) PERMISSIVE INTERVENTION.
 
 
 12
 Upon timely application anyone may be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question of law or fact in common.
 
 
 13
 An application for permissive or intervention of right must be timely. Fed.R.Civ.P. 24(a) and (b). See NAACP v. New York, 413 U.S. 345, 365, 93 S.Ct. 2591, 2602, 37 L.Ed.2d 648 (1973). Michigan Association for Retarded Citizens v. Smith, 657 F.2d 102, 105 (6th Cir. 1981). If untimely, intervention must be denied. Id. Timeliness is a matter within the sound discretion of the district court. NAACP, 413 U.S. at 366, 93 S.Ct. at 2603; Retarded Citizens, 657 F.2d at 105. Unless this discretion is abused, the court's ruling will not be disturbed on review. Id. Timeliness is to be determined from all the circumstances. Id.
 
 
 14
 In Retarded Citizens, Judge Phillips, writing for the court, set forth five factors which are particularly probative in determining whether intervention is timely. The five factors are as follows: 1) the purpose for which intervention is sought; 2) the length of time preceding the application for intervention during which the proposed intervenor knew or reasonably should have known of his interest in the case; 3) the prejudice to the original parties due to the proposed intervenor's failure after he knew of or reasonably should have known of his interest in the case to apply promptly for intervention; 4) the existence of unusual circumstances militating against or in favor of intervention; and 5) the point to which the suit has progressed. Retarded Citizens, 657 F.2d at 105.
 
 
 15
 1. Purpose For Which Intervention Was Sought
 
 
 16
 The first factor the district court considered was the purpose for which intervention was sought. The proposed intervenors' motion to intervene was motivated by the belief that the promotion section of the 1980 Decree diminished the promotional expectations of non-minorities and constituted "reverse discrimination." The proposed intervenors sought to delay the implementation of the promotion provisions of the decree until additional discovery and expert analysis could be conducted. The proffered alternatives the proposed intervenors sought to explore were: 1) the creation of additional positions through restructuring the Fire Department; and 2) the payment of compensation to non-minorities whose promotion expectations were diminished by the 1980 Decree. The district court rejected these alternatives as substantively unavailable as a matter of law. We agree.
 
 
 17
 The district court did not have the authority to restructure the Memphis Fire Department to prevent the 1980 Decree from affecting the promotion expectations of non-minorities. See National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). Moreover, the 1980 Decree is reasonable. Consequently, its operation does not constitute a compensable wrong. See EEOC v. McCall Corp., 633 F.2d 1232, 1238 (6th Cir. 1980); Stotts v. Memphis Fire Department, --- F.2d ---- (6th Cir. 1982); Setser v. Novack Investment Co., 657 F.2d 962, 970 (8th Cir. 1981). In fact, the 1980 Decree does not harm or adversely affect any legally protected interest of non-minorities. Id. There is no legally cognizable interest in promotional expectations which presumptively could only occur as the result of discriminatory employment practices. See Stotts, --- F.2d at ----. Consequently, non-minorities are not entitled to compensation. The district court acted correctly in not delaying the implementation of the decree.
 
 2. Knowledge Of Interest In Case
 
 18
 The court also considered the length of time during which the proposed intervenors actually knew or reasonably should have known of their interest in the Stotts action.[1] See, e.g., Retarded Citizens, 657 F.2d at 105, United Airlines, Inc. v. McDonald, 432 U.S. 385, 394, 97 S.Ct. 2464, 2469, 53 L.Ed.2d 423 (1977); Stallworth v. Monsanto, 558 F.2d 257, 264 (5th Cir. 1977). A party must have been aware of the risk that his interest may be affected by the litigation, Retarded Citizens, 657 F.2d at 105, and that his interest may not be fully protected by the existing litigants. See United Airlines, 432 U.S. at 394, 97 S.Ct. at 2469.
 
 
 19
 The risk that the Stotts action may affect the Fire Department's promotion procedure was inherent from the outset of the litigation. Plaintiff Stotts filed this class action alleging that the Fire Department's promotion policies were racially discriminatory. Obviously, a chief objective of the action was to change the promotion policy. An awareness of the action, therefore, was knowledge that the litigation created a risk that the promotion procedure may be affected.
 
 
 20
 Several newspaper articles published in the Memphis area apprised the proposed intervenors of the Stotts action months before the 1980 Decree was announced. Moreover, the proposed intervenors were aware of the Stotts action and its potential ramifications on December 4, 1979, at the latest. On that date, the TRO issued in the Stotts case enjoined certain promotions within the Fire Department. The TRO alone constituted sufficient notice of the Stotts action and its potential impact on promotions. The notice afforded by the TRO was heightened by the provisions of the 1974 Decree. The 1974 Decree contained provisions which sanctioned the imposition of promotional goals. More importantly, the district court's finding that the TRO made the proposed intervenors aware of the Stotts action is unchallenged and not clearly erroneous.
 
 
 21
 The City, an existing party to the litigation, adequately protected the legally protected interest of non-minorities. At the outset of the litigation, the objective of the City was to refute the allegations of discrimination and maintain the status quo. Maintenance of the status quo was consistent with the objectives and the protection of the legally protected interests of non-minorities.
 
 
 22
 The objectives of the City and some non-minorities may have diverged when the City agreed to a reasonable consent decree which embodied an affirmative action plan. However, the legally protected interests of the City and non-minorities did not. No legally protected interest of non-minorities is adversely affected by a reasonable affirmative action plan.[2] See Stotts v. Memphis Fire Department, 679 F.2d 541 (6th Cir. 1982); McCall Corp., 633 F.2d at 1238; Setser, 657 F.2d at 970. Non-minorities do not have a legally protected interest in promotions which could only occur as the result of presumptively discriminatory employment practices. See Stotts, 679 F.2d at 558. The City has a responsibility to vindicate a societal interest inherent in Title VII in developing race-conscious affirmative action to eliminate the effects of past discrimination. Id.; Detroit Police Officers Assoc. v. Young, 608 F.2d 671, 690 (6th Cir. 1979). The City acts in the interest of both minorities and non-minorities, in agreeing to a reasonable consent decree. Detroit Police Officers Assoc., 608 F.2d at 695-96; Talbert v. Richmond, 648 F.2d 925, 931 (4th Cir. 1981). A reasonable consent decree frees minorities from discrimination while simultaneously preventing non-minorities from being victims of reverse discrimination. In fact, cities, particularly those with significant minority populations, increase the effectiveness of their city services when they implement race-conscious affirmative action designed to attain racial diversity in all levels of municipal government. See Detroit Police Officers Assoc., 608 F.2d at 696; Talbert, 648 F.2d at 931.
 
 
 23
 In the instant case, the court afforded the proposed intervenors an opportunity to air their objections to the 1980 Decree. This is all that the court was required to do given its determination that the 1980 Decree was reasonable. See Metropolitan Housing Development v. Village of Arlington Heights, 616 F.2d 1006, 1014 (7th Cir. 1980); EEOC v. American Telephone and Telegraph Co., 556 F.2d 167, 173 (3d Cir. 1977). The city adequately represented the interest of non-minorities when it agreed to a consent decree which the court determined was reasonable.[3]
 
 3. Prejudice To Original Parties
 
 24
 The prejudice to the original parties due to the failure to intervene after the proposed intervenors knew or reasonably should have known of their interest in the case is the third factor the court considered. See Retarded Citizens, 657 F.2d at 105; Culbreath v. Dukakis, 630 F.2d 15, 21 (1st Cir. 1980). The court considered the effect any delay in the relief afforded by the 1980 Decree would have on the plaintiff class members. The court found that a "good bit of value" would be lost if the implementation of the decree was delayed. Minorities had been virtually excluded from the Memphis Fire Department for decades. The Stotts action was filed in 1977 to correct the effects of the City's past hiring and promotion discrimination. The relief afforded by the decree had been delayed during the three years of discovery and months of negotiations. The prospect of delaying the 1980 Decree while the proposed intervenors engaged in additional discovery and expert analysis prompted the court to state: "It would be unfair and inequitable to postpone any longer the long overdue relief accorded to the plaintiffs and class members herein by the Consent Decree." The prejudice which would have resulted from granting the motion to intervene would have been particularly intolerable in the instant case. The alternative relief the proposed intervenors were attempting to pursue simply was not legally available. The district court acted correctly in considering the detriment minorities would suffer if intervention was allowed. See Retarded Citizens, 657 F.2d at 105.
 
 
 25
 The court also considered the prejudice the City would suffer if the consent decree was not implemented immediately. The City asserted that the TRO previously issued by the court delayed "necessary promotions within the Fire Department." Permitting intervention would have delayed the necessary promotions even longer. The Fire Department's ability to function would have been jeopardized by the delay sought by the proposed intervenors. Manifestly, the public interest in efficient, effective firefighting services required that the court act consistent with the rights of parties to eliminate the disability caused by the TRO at the first opportunity. The district court acted correctly in considering the effect the intervention would have on the functioning of the Fire Department. See Harper v. Kloster, 486 F.2d 1134, 1137 (4th Cir. 1973).
 
 4. Unusual Circumstances
 
 26
 The court has continuing jurisdiction to modify the 1980 Decree should its operation become unreasonable. See United States v. Chicago, 663 F.2d 1354 (7th Cir. 1981) (en banc); United States v. City of Miami, 614 F.2d 1322, 1333-34 (5th Cir. 1980), on reh., 664 F.2d 435 (5th Cir. 1981). This is an important, unusual circumstance militating against allowing intervention.[4] An additional factor which weighed against allowing intervention was the months of settlement negotiations and the three years the case had been pending. The court's consideration of these circumstances was not error. See Retarded Citizens, 657 F.2d at 105; NAACP, 413 U.S. at 366, 93 S.Ct. at 2603.
 
 
 27
 Timeliness is a matter within the sound discretion of the district court. See Retarded Citizens, 657 F.2d at 105; NAACP, 413 U.S. at 366, 93 S.Ct. at 2603. Unless this discretion has been abused, the district court's ruling will not be disturbed on appeal. Id. The district court did not abuse its discretion in ruling that the motion to intervene filed by eleven non-minority firemen was untimely. Judge McRae's careful and delicate consideration of the factors for determining timeliness was commendable. Accordingly, we affirm the judgment of the district court.[5]
 
 
 28
 BOYCE F. MARTIN, Jr., Circuit Judge, dissenting.
 
 
 29
 I dissent for the following reasons. In my view, Judge McRae applied an incorrect standard to measure the timeliness of the intervention motion. Because I feel strongly that appellants are entitled to their day in court as intervenors, I write separately, setting forth my reading of the record and my analysis of the timeliness inquiry.
 
 
 30
 The sole issue presented by the proposed intervenors' appeal concerns the timeliness of a motion to intervene as of right under Federal Rule of Civil Procedure 24(a)(2). Appellants are a group of eleven white employees of the Memphis Fire Department, informally called "Firefighters for a More Appropriate Remedy." They petitioned for leave to intervene in a class action brought by black firefighters alleging racial discrimination in the Fire Department's hiring and promoting practices. Soon after appellants learned that the Department had agreed to settle the case by consent decree, they sought intervention for the limited purpose of shaping a less burdensome remedy for future promotions within the Memphis Fire Department.
 
 
 31
 Both the class representatives and the Department opposed intervention. Appellants now challenge denial of their motion, which they filed before the District Court finally approved the consent decree. On May 16, 1980, the District Court denied appellants' motion as untimely. Today the majority affirms this ruling. I would reverse for the following reasons.
 
 I. HISTORY OF THE LITIGATION
 
 32
 Because the timeliness of the motion is the central issue on appeal, I will describe briefly the history of the Memphis Fire Department litigation. I state the facts separately because I interpret the record differently than does the majority. On November 27, 1974, the United States Department of Justice and the City of Memphis entered a consent decree which terminated a suit brought by the Attorney General to enforce the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. In the 1974 decree, the City denied the government's charges of past sex and race discrimination, but agreed to establish goals for hiring more blacks and women, in numbers "approximating (their) respective proportions in the civilian labor force." As an interim goal, the City also promised to attempt to fill at least fifty percent of all City vacancies with qualified black applicants. The decree applied to various City agencies, including the Fire Department.
 
 
 33
 On February 16, 1977, Carl Stotts, a black Fire Fighting Captain, sued the Fire Department, alleging that he and other similarly situated blacks had been denied promotions because of their race. After discovery had been taken, the District Court certified the Stotts suit as a class action. On June 19, 1979, Fred Jones, a black Fire Fighting Private, brought an individual action against the Fire Department, alleging that the Department had not promoted him to Fire Inspector because he is black.
 
 
 34
 Three months after Jones filed his complaint, the District Court consolidated the Fire Department cases for trial. Shortly thereafter, the Fire Department moved for summary judgment and class decertification. On December 12, 1979, the District Court denied both motions. One week earlier, the plaintiffs had requested and received an order temporarily restraining all imminent promotions of blacks and whites in the Department's Fire Prevention Bureau, to prevent "irreparable injury" to black employees. Nineteen promotions in the Bureau were postponed until February 7, 1980, a tentative trial date.
 
 
 35
 The litigants informed the District Court on February 25, 1980 that they were negotiating the terms of a consent decree to settle their dispute. Two months later, the court held a hearing and conditionally approved a proposed agreement submitted by the Department and the black firefighters. The District Court ordered the parties to post a copy of the proposed settlement in each City fire house until May 12, 1980 to allow class members fifteen days in which to review its contents and to file any objections with the court. At this hearing the court asked counsel for the Department whether he expected anyone to object to the decree. Counsel replied that the firefighters' union might object.
 
 
 36
 No objections were filed by class members or the union within the fifteen-day period. However, on May 12, 1980, appellants filed their motion to intervene in their own right and as representatives of non-minority employees. Appellants feared that the proposed decree threatened their interests because the Department had agreed to institute an affirmative promotional system whereby twenty percent of all future promotions would be filled by minority employees.
 
 
 37
 On May 16, 1980, the District Court held a hearing at which appellants stated their case for intervention. They emphasized that they did not object to entry of the decree, nor did they seek to delay implementation of those provisions that advanced the rights of black employees. Appellants challenged the decree only to the extent that it might hamper or foreclose future promotions of white employees. To protect their "important interest" in the matter, appellants requested intervention as an opportunity to present and explore alternative remedies that would place the burden of compliance on the wrongdoer-the Fire Department-rather than on innocent employees. One possible remedy advanced by appellants to distribute the burden more equitably was front pay and constructive promotion for white firefighters. Appellants also suggested monetary relief or Department reorganizations as alternatives which might prove less burdensome. The only immediate relief appellants requested was postponement of the twenty percent future promotional provision, until its adverse impact on white firefighters could be examined.
 
 
 38
 Appellants also argued that their motion was timely, because they filed it a mere two weeks after they first learned that the Department had negotiated a settlement that would impair their interests and those of all white firefighters. According to appellant, they had no indication that the Department was no longer "hotly contesting" the litigation until they saw the notices posted in the fire houses. All eleven applicants stated that they were never notified formally about either the underlying litigation or the settlement negotiations. As proof that the Department inadequately represented their interests in both settling the case and in the substantive provisions of the consent decree, appellants offered several affidavits in which the affiants stated that the City Attorney admitted to them that the Department settled the case to avoid the expense of a trial.
 
 
 39
 At the hearing, both the Department and the plaintiffs voiced their opposition to the proposed intervention. The District Court denied the motion, making the following observations:
 
 
 40
 (O)ne of the factors is whether it is going to delay the relief that will be achieved by trial or settlement or whatever it is, and this case has had a good bit of impact on the Fire Department. I have issued some injunctive relief that the City has-that has caused the City to appear in court and assert to the court that necessary promotions in the Fire Department were being held up because of this litigation.... and also I think that there is a good bit of value to be obtained, certainly as far as the minority people, of going ahead and getting this thing over with.
 
 
 41
 Now I don't care when we do it. Somebody is going to be unhappy. And I would not be a party to any of this constructive promotion bit. That's not much good for anybody. And it is certainly not good-well, that's no way to run a fire department, and to create more top jobs is no solution. I think this relief is only a goal to be attempted, and it's not any ironclad requirement, and I think it is long overdue. I don't believe it would be right to let someone come in at the last minute and interfere with the implementation of this. I might also observe that I think the provisions of the consent decree are reasonable, and therefore, on the merits I see no great need to let somebody intervene.
 
 
 42
 The District Court supplemented its reasons for denying intervention in a subsequent memorandum. The court at all times treated the motion as one for intervention as of right under Rule 24(a)(2), and found that it was untimely because the suits had been pending for almost three years. In addition, the court reasoned that because "all promotions have been stayed since 12/5/79",[1] appellants have been "on notice of the pendency of (the) actions at least since that time." The court rejected the argument that timeliness should be measured from the date the appellants first learned that the settlement would harm their interests. It found that "the intervenors adopted a 'wait-and-see' posture with respect to this litigation and (they) have waited too long to come forward."
 
 
 43
 Based on the record and the oral ruling of the District Court, which the majority fails to quote, I cannot agree that the court "afforded the proposed intervenors a full opportunity to air their objections to the 1980 decree." Majority op. at 585-586 (emphasis added). Nor can I agree that the court below fully considered the alternatives proposed and rejected them as "substantively unavailable as a matter of law," as the majority asserts. The District Judge simply concluded that "that's no way to run a fire department." Finally, I cannot agree with the majority's analysis of the timeliness inquiry, which supports its conclusion that the District Court ruled correctly on the motion.
 
 II. INTERVENTION AS OF RIGHT IN GENERAL
 
 44
 A motion for intervention must be timely, whether it is brought under section (a) or section (b) of Rule 24. Under Rule 24(a)(2), an applicant shall be permitted to intervene in an action:
 
 
 45
 (1) when (he) claims an interest relating to the property or transaction which is the subject of the action and (2) he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, (3) unless (his) interest is adequately represented by existing parties.
 
 A. Interest and Impairment
 
 46
 Before I discuss the timeliness of the appellants' motion, I must first discuss the Rule's other requirements. As an initial matter, it is clear that white firefighters have an interest relating to the subject matter of the action. The majority incorrectly asserts that the decree does not "adversely affect any legally protected interests of non-minorities," to justify its conclusion that appellants have not shown an "interest" in the subject matter of the suit. Although it is true that appellants do not have a vested right to rank order selection in a particular manner or sequence, unless perhaps such an order is secured by a collective bargaining agreement or other contract, appellants do have an interest in protecting and advancing their promotional opportunities within the Department. This is all that the Rule requires-a showing of "an interest relating to the property or transaction" involved in the suit. The Supreme Court has stated unequivocally that non-minorities enjoy legitimate "expectations" of promotions and seniority, which must be balanced against those interests of discriminatees in Title VII cases. Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 375-376, 97 S.Ct. 1843, 1874-1875, 52 L.Ed.2d 396 (1977). Recently the Seventh Circuit recognized the validity of non-minority interests in promotional expectations when it modified an injunction to reduce minority promotional quotas from forty percent to twenty-five percent. The court ordered the reduction because the higher quota was unfair to non-minorities on the eligibility roster who were passed over as a result of the forty percent quota: "Because we have concluded that continuance of the forty percent promotional goal is not justified ... failure to grant modification would unnecessarily and therefore unjustly defeat the opportunities for promotion of these innocent persons." United States v. City of Chicago, 663 F.2d 1354, 1361 (7th Cir. 1981) (emphasis added). I can only conclude from these authorities that an interest sufficient to compel modification of a permanent injunction is a sufficient "interest" for purposes of Rule 24(a)(2).[2]
 
 
 47
 The consent decree, with its twenty percent minority promotional quota, affects the white firefighters' interest in career advancement by reducing the likelihood that they will be promoted on schedule. This interest is quite obviously antagonistic to that of the Fire Department. In my view, appellants' interests are also adverse to those of the minority firefighters. I disagree with the majority's assertion that minority and non-minority employees' interests are compatible in the context of an employment discrimination suit. It is a fact that non-minorities typically have been required "to bear the burden" of remedial measures taken to correct the effects of past discrimination by employers. Detroit Police Officers' Association v. Young, 608 F.2d 671, 696 (6th Cir. 1979), cert. denied, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981). An affirmative action promotional goal contains the seeds for anger and discord in the workforce. As two authors have noted, remedies which displace whites "exacerbate minority-majority tensions which are already explosive.... Put differently, displacement of whites lends credence to the idea that majority-minority interests are inherently opposed...." Burke & Chase, Resolving the Seniority/Minority Layoffs Conflict: An Employer-Targeted Approach, 13 Harv.Civ.R.-Civ.Lib.L.Rev. 81, 94 (1978). This observation is lamentable but valid.
 
 
 48
 Appellants satisfy the impairment requirement as well. It is clear that the decree may, as a practical matter, impair appellants' interest because the Department is bound to follow the decree's promotional goals. Appellants cannot vindicate their interest in a separate proceeding because the consent decree is immune from collateral attack. See generally Cascade Natural Gas Co. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967); Stallworth v. Monsanto Co., 558 F.2d 257 (5th Cir. 1977); 7A Wright & Miller, Fed.Prac. & Proc. § 1908 (West 1972). I conclude that appellants satisfy Rule 24(a)(2)'s first two requirements.
 
 B. Adequacy of Representation
 
 49
 Some doubt exists whether an applicant or an opponent bears the burden of proving or disproving inadequate or adequate representation.[3] Nevertheless, the applicant's burden of showing inadequate representation is "minimal." Trbovich v. United Mine Workers, 404 U.S. 528, 538 n.10, 92 S.Ct. 630, 636 n.10, 30 L.Ed.2d 686 (1972). An applicant for intervention as of right satisfies the requirement by demonstrating that representation of his interest may be inadequate. Id.; Corby Recreation, Inc. v. General Electric Co., 581 F.2d 175 (8th Cir. 1978) (per curiam); Natural Resource Defense Council, Inc. v. United States Nuclear Reg. Comm., 578 F.2d 1341 (10th Cir. 1978).
 
 
 50
 I reject the majority's conclusion that the Fire Department adequately represented the white firefighters in the settlement negotiations and the consent decree. The majority reasons that the Department acted in the "public interest" by adopting a "reasonable consent decree", therefore all interests, including those of non-minorities, were adequately represented. The majority relies on its earlier conclusion that non-minorities have no interest which could be adversely affected by an affirmative action plan. In my view, the majority misses the point of Trbovich's inadequacy analysis. Although the logic of the majority's articulated reasons is hard to follow, perhaps it can be interpreted as a form of an argument advanced by appellees in this case. Appellees suggest that a state or governmental entity is presumed to represent its citizens adequately in public litigation. See Commonwealth of Pa. v. Rizzo, 530 F.2d 501 (3rd Cir.), cert. denied, 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976). I agree that under normal circumstances a state body is entitled to a presumption of adequacy. However, when the state acts in a proprietary role, different considerations apply. In my view, when the state is sued in its private capacity as an employer, it makes little sense to presume that it adequately represents the interests of its adversaries, namely its employees. Although the Department was sued originally by black employees, in the context of an employment discrimination suit when an employer may be forced to make large concessions to one group at the expense of another, all employees are potential adversaries.
 
 
 51
 In this situation, the Department's interests were not clearly adverse to those of the white firefighters until the Department negotiated and signed the consent decree. At this juncture, the presumption of adequacy vanished. In the decree, the Department consented to a twenty percent minority promotional goal which would not affect the operation of the Department, but which would affect promotional opportunities for whites. This provision of the decree gives appellants a distinct divergent interest from that of the Department. A fortiori, the Department cannot protect it adequately. This is sufficient to satisfy Trbovich's minimal showing of inadequate representation. See also United Airlines, Inc. v. McDonald, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977); Liddell v. Caldwell, 546 F.2d 768 (8th Cir. 1976), cert. denied, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977); Smuck v. Hobson, 408 F.2d 175 (D.C.Cir.1969).
 
 C. Timeliness
 
 52
 I turn to discuss Rule 24's threshold requirement of timeliness. The concept of Rule 24 timeliness is vague. Neither the Rule itself nor the courts have defined or clarified it with precision or consistency. Because of, or rather despite its vagueness, the question of timeliness has been left to the sound discretion of the district courts. The scope of appellate review is therefore limited to the question whether the District Court abused its discretion or erred as a matter of law in denying appellants' motion. Michigan Ass'n for Retarded Citizens v. Smith, 657 F.2d 102 (6th Cir. 1981).
 
 
 53
 The broad discretion that the Rule vests in the district courts has been criticized because it virtually shields a district court's timeliness decision from effective appellate review. E.g. Jones, Litigation Without Representation: The Need for Intervention to Affirm Affirmative Action, 14 Harv.Civ.Rights-Civ.Lib.L.Rev. 31 (1979); Note, The Timeliness Threat to Intervention of Right, 89 Yale L.J. 586 (1980). However, an appellate court's ability to review a district court's timeliness determination should not be as limited as these critics fear. This court has stated that timeliness must be "determined from all the circumstances", Michigan Ass'n for Retarded Citizens v. Smith, 657 F.2d at 105 quoting NAACP v. New York, 413 U.S. 345, 365, 93 S.Ct. 2591, 2602, 37 L.Ed.2d 648 (1973), rather than from purely chronological circumstances. A court is not free to design its own calculus of circumstance. Rather, four critical factors must govern the timeliness inquiry,[4] in my view.
 
 
 54
 (1). Initially a court must consider the length of time that an applicant either knew or reasonably should have known of his interest in the case, before he sought to intervene. United Airlines v. McDonald, supra; Michigan Ass'n for Retarded Citizens v. Smith, supra; Stallworth v. Monsanto Co., supra. For purposes of this inquiry, the time the proceedings were initiated is largely irrelevant, as is the time an applicant first learns of the proceedings. Although NAACP v. New York contains language suggesting that promptness can be measured from the time a proposed intervenor learns that litigation is pending,[5] I reject this reading of the Rule. As the Fifth Circuit points out in Stallworth, the Supreme Court in United Airlines, a more recent opinion, measured promptness from the time the applicant first learned that her interests "would no longer be protected by the named class representatives," rather than from the time she first learned of the lawsuit. Stallworth v. Monsanto Co., 558 F.2d at 264. In my view, knowledge that litigation is pending is pertinent to Rule 24 timeliness only when its acquisition coincides with an applicant's realization that his interests are threatened and unprotected by existing parties.
 
 
 55
 This Circuit's decision in Retarded Citizens, however, suggests that the length of time a suit has been pending is a relevant consideration. I rely on that decision in my analysis only to the extent that Retarded Citizens is consistent with United Airlines, the Supreme Court's most recent and expansive treatment of Rule 24 timeliness. Retarded Citizens neither cites nor discusses United Airlines, which departs from NAACP v. New York. I therefore question Retarded Citizens in an attempt to bring this Circuit within the ambit of the Supreme Court's pronouncements. Retarded Citizens relies exclusively on NAACP v. New York as authority for the statement that "although the point to which a suit has progressed is one factor in the determination of timeliness, it is not solely dispositive." 657 F.2d at 105. The validity of this statement is doubtful, given the Supreme Court's clear directive in United Airlines that time starts to run against an intervenor only from the moment he knows that his interest in a case has not been or is no longer being protected by existing parties. Assuming arguendo that a court may properly consider the length of time a suit has been pending, Retarded Citizens states plainly that "this is not dispositive." 657 F.2d at 105.
 
 
 56
 (2). A court must also consider whether the existing parties will suffer prejudice from an applicant's "failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case." Id. (emphasis added); Culbreath v. Dukakis, 630 F.2d at 21; Stallworth v. Monsanto Co., 558 F.2d at 265. The prejudice inquiry is narrow: only that prejudice attributable to a movant's failure to act promptly may be considered. The broader factor of prejudice that may flow from the intervention itself does not weigh in the balance. A broad examination of prejudice is appropriate only when a court considers a motion for permissive intervention under Rule 24(b), which expressly directs the court to "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." See Note, The Timeliness Threat to Intervention, supra. Rule 24(a)(2) does not contain similar language, and should not be interpreted in a similar way.
 
 
 57
 (3). The third factor a court must consider is whether the applicant will be harmed if he is not allowed to intervene. Stallworth v. Monsanto Co., supra. This component is self-explanatory, but I note that principles of basic fairness should guide a court in determining whether an applicant should have an opportunity to be heard.
 
 
 58
 (4). Fourth, a court must evaluate any unusual circumstances militating either for or against intervention. Michigan Ass'n for Retarded Citizens v. Smith, supra. Finally, in Retarded Citizens, Judge Phillips stated that a court should also consider the purpose for which intervention is sought. This purpose may, in a given case, tip the balance in favor of timeliness.
 
 
 59
 III. THE DISTRICT COURT'S AND THE MAJORITY'S TIMELINESS ANALYSIS
 
 
 60
 With the foregoing principles in mind, I must conclude that the District Court erred in denying the motion as untimely. First, the court measured promptness by an incorrect legal standard. The court considered the motion's timeliness by reference to "the length of time these cases have been pending." It concluded that appellants had been on notice of the litigation since December 5, 1979, the date certain promotions in the Fire Prevention Bureau were frozen. The court thus incorrectly held that time began to run against the applicants from the moment that they first learned or reasonably should have learned about the class action. Even assuming that a court may properly consider the length of time a case has been pending, Judge McRae abused his discretion in my view by exalting this favor over all other relevant considerations.
 
 
 61
 In affirming the District Court's order, the majority implicitly holds that time starts to run against an applicant when he first learns of the proceedings. The Fifth Circuit rejected the very rule the majority approves in this case, for fear that it:
 
 
 62
 would encourage individuals to seek intervention at a time when they ordinarily can possess only a small amount of information concerning the character and potential ramifications of the lawsuit, and when the probability that they will misjudge the need for intervention is correspondingly high ... Such a rule would also mean that many individuals who excusably failed to appreciate the significance of a suit at the time it was filed would be barred from intervening to protect their interests when its importance became apparent to them later on.
 
 
 63
 Stallworth v. Monsanto Co., 558 F.2d at 265. See also United Airlines v. McDonald, 432 U.S. at 394, n.15, 97 S.Ct. at 2469, n.15. In my view, such a rule is both unsound and unfair. The majority completely ignores the reasons Judge McRae explicitly gave for denying the motion: "The motion to intervene is not timely because of the length of time these cases have been pending.... This court is of the opinion that the proposed intervenors have been on notice of the pendency of these actions (since the time) all promotions have been stayed." Judge McRae rejected appellants' assertions that the consent decree itself : (1) notified them for the first time that their interests were threatened; and (2) triggered their right to intervene. He simply measured timeliness from the moment the appellants learned that the lawsuit was pending. I believe this to be error.
 
 
 64
 In an attempt to avoid acknowledging the District Court's error, the majority speculates that appellants must have known that the litigation would ultimately affect the Department's promotional policies, when appellants first became aware of the lawsuit from the Memphis media. At the very latest, the majority speculates, appellants should have recognized the risk when the court temporarily restrained a small number of promotions in one bureau of the Department. I would reject this hypothesis for several reasons. First, it is so conjectural that it is meaningless. Any applicant who moved to intervene in a proceeding asserting a possibility that his interests might be affected by some aspect of a future judgment would face an uphill battle indeed to satisfy Rule 24(a)(2)'s interest, inadequacy, and impairment requirements. The Rule requires a showing beyond a merely speculative interest. See, e.g., Penick v. Columbus Educ. Ass'n, 574 F.2d 889 (6th Cir. 1978). The majority's interpretation of the Rule requires an applicant to move for intervention at a time when it would be impracticable and impossible to predict the ramifications of a lawsuit upon the applicant.
 
 
 65
 Second, the majority ignores the fact that appellants are concerned only with the fairness and operation of the twenty percent goal, which first surfaced publicly when the consent decree was published on April 25, 1980. I fail to see how a temporary order restraining a few promotions in one bureau of a large Fire Department-not one of which affected any of the appellants personally-could have apprised appellants of the likelihood that the Department would adopt a Department-wide affirmative action promotional plan. I admire the prescience of anyone who could have predicted that the Department would eventually volunteer affirmative action relief. Such a prediction would have been impossible in this case because the agreement was born of four months of intense, unpublicized negotiations. Furthermore, the Department objected vigorously to the restraining order, arguing that the promotions were necessary for efficient operation. In fact, the Department bitterly contested the litigation at every step until it announced that it would settle the case. The Department also rejected the suggestion that it create temporary positions. Given these facts, I cannot agree that appellants should have guessed that the Department would: (1) settle the case at all; and (2) voluntarily agree to institute Department-wide affirmative promotional goals.
 
 
 66
 Furthermore, I find no support in the record for the District Court's comment that appellants "adopted a wait-and-see posture." The majority views this comment as dispositive of the appeal. The only evidence on this issue convinces me that appellants did not learn about the consent decree and the adverse impact of its promotional goals until copies were posted in each firehouse. The affiants who supported the motion all stated that they were not notified that the parties had negotiated a settlement until April 25, 1980, when the consent decree first surfaced publicly. Neither the record parties nor the court took any steps before this date to inform appellants that the litigation would soon terminate by mutual consent. The majority can point to nothing in the record to show that appellants knew about the decree itself, let alone its potential impact on them, before April 25. In my view, appellants acted promptly by filing their motion two weeks after they first saw the decree on the firehouse wall.
 
 
 67
 The majority fails to recognize that an agreement to settle bitterly contested litigation by consent decree is in itself an event that will trigger the need and the right to intervene. Generally it has been held that intervention is timely and permissible even after parties have agreed to settle litigation by decree. In Piambino v. Bailey, 610 F.2d 1306 (5th Cir.), cert. denied, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980), the Fifth Circuit held that a non-party's right to intervene was triggered by the publication of an adverse settlement agreement. In Baker v. City of Detroit, 504 F.Supp. 841 (E.D.Mich.1980), Judge Keith, sitting by designation, awarded attorneys' fees to a group of black police officers who had intervened in a reverse discrimination suit to protect their interests. Although timeliness was not at issue in Baker, I note that intervention was granted three years after the suit was filed, virtually on the eve of trial. Judge Keith commented: "(W)ith the wisdom of hindsight ... (p)erhaps the intervenors should have moved to intervene earlier. However, the plaintiffs suffered no prejudice from this." 504 F.Supp. at 849. In deciding to award attorneys' fees to intervenors' counsel, Judge Keith discussed at length the circumstances precipitating intervention, commenting:
 
 
 68
 Had black officers or the United States Government filed a suit alleging illegal discrimination on the part of the City of Detroit and seeking affirmative relief, it is likely that such a suit would have settled and a consent decree entered. That consent decree would then have been subject to judicial review, after due opportunity for intervention and/or objection by white officers.
 
 
 69
 Id. at 847 (emphasis added). "Then" is a temporal word meaning "thereafter" or "subsequently." Judge Keith's use of this language is clear recognition that post-consent decree intervention by white employees is appropriate in general, and in the case before us. Nevertheless, Judge Keith now sanctions a rule which, in effect, rejects intervention as a legitimate means by which to challenge a consent decree. The majority's analysis places an unfair and unjustifiable burden on a potential intervenor to predict the likely outcome of a complex case, well before the issues have crystallized. Furthermore, its analysis denies to unrepresented persons the right to challenge broad remedies which may impinge upon their interests.
 
 
 70
 I cannot accept the majority's assertion that several newspaper articles should have apprised appellants that this litigation would compromise their interest in future promotions. Just a glance at these articles convinces me that they cannot serve as adequate notice. Not one mentions the nature and scope of the broad affirmative relief that the Department ultimately adopted in the Decree. The March 11, 1978 article merely described the complaint, stating that plaintiffs sought back pay; the headline on the September 11, 1978 article, "Fire Department Suit Seeks Back Pay", did not mention affirmative relief in the nature of promotional goals; and the December 5, 1979 article, "Promotions at Fire Bureau Blocked by Court's Ruling", neither discussed nor intimated in any way that the Department would adopt promotional goals in a consent decree. In short, not one of the articles predicted that the case would be settled. Nor did they describe the relief that such a settlement would provide. In my view, the articles could not have informed eleven unsophisticated firefighters about the possibility of affirmative promotional goals.
 
 
 71
 I turn to discuss the District Court's second error in ruling on appellants' motion. Judge McRae erroneously considered the prejudice existing parties would suffer if intervention were allowed. In its order, the court stated that "it would be unfair and inequitable to postpone any longer the long overdue relief accorded to the plaintiffs and class members herein by the consent decree." The court's concern, although admirable, improperly injects a foreign element into the Rule 24(a)(2) calculus. The law in this Circuit, announced by Judges Keith and Phillips in Retarded Citizens is crystalline: a judge may consider only that prejudice the original parties would suffer from a proposed intervenor's failure to move promptly after he knew or reasonably should have known that his interests were threatened. The prejudice inquiry is narrow, limited to such considerations as the disappearance of evidence and the unavailability of witnesses. United Airlines v. McDonald, 432 U.S. at 393 n.14, 97 S.Ct. at 2469 n.14. This element of the timeliness inquiry does not permit broad assessments of the fairness to existing parties of the substance of an intervenor's challenge.
 
 
 72
 The majority, however, approves Judge McRae's conclusion that it would be unfair to both parties to allow intervention at all, stating that the delay from an evidentiary hearing would be "intolerable" and would "jeopardize" the Fire Department's "ability to function." I submit that the majority ignores the clear directives of this Circuit and the Supreme Court in Retarded Citizens and United Airlines. The court below should have considered only the prejudice the parties might suffer from the two weeks that lapsed before appellants filed their motion. I reiterate my view that a broad assessment of prejudice in the context of intervention as of right improperly collapses the distinction between this form of intervention and permissive intervention.
 
 
 73
 In my view, the existing parties can show no prejudice from a delay of two weeks. I note that appellants filed their motion within the period set for class members to object. In United Airlines, the Supreme Court decided that a comparable delay in filing was not prejudicial:
 
 
 74
 The motion to intervene was filed less than three weeks after the 'settlement' was incorporated in the District Court's final judgment.... There is no reason to believe that in that short period of time, (the existing parties) discarded evidence or (were) otherwise prejudiced.
 
 
 75
 432 U.S. at 393, n.14, 97 S.Ct. at 2469, n.14, quoted in Stallworth v. Monsanto Co., 558 F.2d at 267. (citations omitted, emphasis added). Furthermore, the consent decree was not yet etched in stone on April 25, 1980, the day on which it was preliminarily approved and posted. The appellants filed their motion within the fifteen-day period set for comment and objection by class members. Both parties anticipated that the union might object to the decree within this time. I must therefore assume that intervention by the union was a distinct possibility that all parties recognized, including the court. These facts undermine the conclusion that the parties would have been prejudiced by intervention. The record shows that all parties contemplated objections and anticipated delay.
 
 
 76
 The District Court erred in two other respects. First, the District Court failed to examine whether, and to what extent, appellants would be harmed should intervention be denied. The court summarily concluded that the decree "does not necessarily trammel the interests of non-minorities in promotion." Without more, we are left to speculate whether the court implicitly found that appellants would not be harmed. I believe, in this respect, the court's analysis is fatally deficient.
 
 
 77
 Second, the District Court did not consider special circumstances militating either for or against a finding of timeliness. In my view, one factor strongly supports appellants' motion: the limited role they wish to play as intervenors. They did not object to entry of the decree, nor did they try to delay the proceedings. They merely asked to participate in fashioning an equitable system for future promotions that would not shift the entire burden of compensation to white firefighters. Given this limited role, I cannot ignore the possibility that appellants' participation could have helped all parties in shaping a better remedy. Intervention at the remedial stage of complex litigation is often particularly appropriate, because it can provide a court with information necessary for an informed judgment. As Judge Robinson observed in Hodgson v. United Mine Workers of America, 473 F.2d 118, 129 (D.C.Cir.1972): "Timeliness presents no automatic barrier to intervention in post-judgment proceedings where substantial problems in formulating relief remain to be resolved." (emphasis added). See also Cascade Natural Gas Corp. v. El Paso Natural Gas Corp., supra; EEOC v. AT&T, 506 F.2d 735 (3rd Cir. 1974); System Federation No. 91 v. Reed, 180 F.2d 991 (6th Cir. 1950). The majority fails, in my view, to appreciate the importance of post-judgment intervention when difficult remedial problems are presented.
 
 
 78
 In United States v. Reserve Mining Co., 56 F.R.D. 408 (D.Minn.1972), a pollution abatement action in which fifteen groups and individuals moved to intervene, the court praised multi-party intervention as a means of shaping the most suitable remedy:Assuming that the end result which the United States is seeking is an abatement of pollution of Lake Superior by Reserve Mining Company, the Court must assume that there is more than one method of achieving that abatement. If the environmental groups (seeking intervention) maintain an interest in a specific form of abatement, which they feel will better protect their asserted interests, the Court should be willing to hear such evidence, if the best possible judgment is to be rendered. It must be remembered that this litigation is narrowly confined to one particular discharge, by one particular company, and that additional evidence as to alternative methods of abatement, in the event pollution should be proved, will be in the light of the alleged injury of minimal cost and inconvenience to the parties to the lawsuit, but will necessarily lead to a more informed decision by this Court on the merits of the controversy.
 
 
 79
 Id. at 418-19.
 
 
 80
 In Liddell v. Caldwell, supra, the Eighth Circuit revised a lower court's ruling that a 24(a)(2) motion was untimely. Six black students and the St. Louis NAACP filed their motion three years after the District Court had publicly invited all interested parties to intervene in the St. Louis desegregation litigation. At the time the applicants moved to intervene, the court had already approved a consent decree, which had taken years to construct. The Court of Appeals, in reversing, noted that: "the petitioner's primary purpose in seeking intervention relates to their objections to the proposed remedy, that is, to the ultimate plan of desegregation." 546 F.2d at 771. Because the issues were complex, and equitable remedies difficult to fashion, the Eighth Circuit remanded the case, directing the lower court to allow intervention, and suggesting that it invite others to intervene, including the U.S. Department of Justice and the State Board of Education.
 
 
 81
 In my view, the circumstances of this case are just as complex as those in Reserve Mining and Liddell, and the task of shaping equitable relief just as difficult. The District Court acted irresponsibly in dismissing the appellants' suggestions for alternative relief, commenting that it "would not be a party to this constructive promotion bit ... well, that's no way to run a fire department...." Although I would reserve judgment on the merits of any alternatives advanced in this case, I think that at the very least the appellants deserved the opportunity to adduce information about alternative remedies.
 
 
 82
 Had intervention been granted in this case, limited to a hearing describing and defending alternative promotional plans, the District Court could have resolved the merits of the proposals in short order, with little or no delay. Such a course of action was taken in Newburgh Area Council, Inc. v. Board of Educ., 489 F.2d 925 (6th Cir. 1973), vacated and remanded, 418 U.S. 918, 94 S.Ct. 3208, 41 L.Ed.2d 1160 (1974), reinstated upon remand, 510 F.2d 1358 (6th Cir. 1974), cert. denied, 421 U.S. 931, 95 S.Ct. 1658, 46 L.Ed.2d 88 (1975). In that case we ordered the District Court to integrate the Jefferson County, Kentucky school system. On remand, the District Court implemented its own desegregation plan, after finding the parties' proposals inadequate. At this advanced stage of the proceedings, the elected county chief executive officer, Jefferson County Judge Hollenbach moved to intervene under Rules 24(a) and (b) for the limited purpose of proposing an alternative desegregation plan. The existing parties objected strenuously. Nevertheless, the court granted conditional intervention, limited to an offer and defense of an alternative plan.
 
 
 83
 Hearings were held subsequently and the Hollenbach proposal was rejected. On May 18, 1976, the County Judge was dismissed as an intervenor. This action was affirmed and the County Judge's appeal was dismissed by order of this court on March 11, 1977. Haycraft v. Hollenbach, cert. denied, 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977). The Hollenbach case is germane to the present dispute for several reasons. First, it establishes that post-judgment intervention is timely and appropriate in complex cases affecting numerous and divergent interests. Second, it underscores the validity of allowing unrepresented interested parties to advance and explore alternative remedies. Third, it illustrates the speed with which issues raised by intervenors can be resolved. The County Judge had his day in court-an opportunity to present expert witnesses in defense of his plan. Based on the evidence and its view of the merits of the plan, the District Court rejected the intervenor's alternative and dismissed him from the case. The entire issue was resolved in less than one month: the alternative plan was submitted on April 22, 1976; the matter was heard and rejected on May 4, 1976; and the intervenor was dismissed. Ultimately, the intervenor was ordered to pay the parties' attorneys fees incurred in objecting to his proposal. In the interim, the court-ordered plan continued in effect and the operation of the school system was not disrupted.
 
 
 84
 The course of subsequent events in the present case also tips the scale in favor of intervention. We heard this appeal together with an appeal on the merits of the Stotts litigation,[6] challenging a recent modification of the 1980 decree. Today this court affirms modification of the Decree.[7] The class representatives sought a preliminary injunction prohibiting the Fire Department from using a "last hired-first fired" formula to lay-off employees, in response to an announcement made early in 1981 that the City of Memphis planned to lay-off active personnel because of fiscal problems. The City intended to implement this lay-off policy by measuring seniority on a City-wide basis. Under the plan, those employees in danger of elimination who had sufficient seniority could choose to be demoted rather than laid-off.
 
 
 85
 On May 4, 1981, the District Court temporarily restrained the Department from laying off or demoting blacks occupying certain positions within the Department. On May 5, 1981, the firefighters' Union intervened by consent of the parties, asserting that lay-offs must be made according to city-wide seniority, as provided by the union's memorandum of understanding with the City. After additional hearings, the court issued a preliminary injunction prohibiting use of any lay-off policy that would decrease the percentage of blacks employed in eleven job categories. The District Court's injunction rested in part on the conclusion that the City's seniority system was not bona fide because of its discriminatory effect.
 
 
 86
 It is clear from these events that the Memphis Fire Department litigation has an ever-widening impact on non-minority employees. The consent decree has been modified-an extraordinary remedy-to reach employment practices that the original settlement did not encompass. No provision was made in either the 1974 or the 1980 decree for lay-off procedures, rank reductions, or demotions. The union has been allowed to intervene to contest the effect that the modified decree will have on its memorandum of understanding. I think appellants should have the opportunity to present and protect their interests, in light of the fact that the decree has been substantially modified. The need for intervention becomes acute when a court exercises its supervisory powers to alter a consent decree. See Bolden v. Pennsylvania State Police, 578 F.2d 912 (3rd Cir. 1978) (Garth, J. concurring in part, dissenting in part); United States v. Reserve Mining Co., supra.
 
 
 87
 In Penick v. Columbus Educ. Assn., 574 F.2d 889 (6th Cir. 1978), we affirmed denial of a motion for permissive intervention made by "CEA", the bargaining unit for the Columbus, Ohio public school teachers. Applicants filed their motion at the remedial stage of school desegregation proceedings. We deemed the application to be permissive, governed by Rule 24(b), because CEA did not show that the Columbus School Board did not adequately represent its interests. We noted:We would emphasize that the District Court has not required specific contract adjustments or staff assignments to be included in the desegregation plan, although the possibility that some court action might be necessary in the future has not been foreclosed. The thrust of the District Court's decisions ... has been to encourage negotiation and accommodation of the Board with all interested persons and groups, without the direct involvement of the court. In these circumstances it appears that the DEA has not specifically suggested any interests which have been or are likely to be harmed by the court's disposition of the litigation.
 
 
 88
 Id. at 890. We were careful in Penick, however, to state that intervention by CEA at a future time might be required should circumstances change:
 
 
 89
 (I)n view of the fact that the District Court has retained jurisdiction over the case and may conceivably find it necessary in the future to make court-ordered adjustments and assignments of faculty and staff, our decision is reached without prejudice to the right of the CEA to seek intervention at a later date should it become apparent that CEA interests are not being adequately represented in further proceedings before the District Court.
 
 
 90
 Id. at 891. See also EEOC v. AT&T, supra. I believe that Penick stands for the proposition that intervention must be considered and should be allowed in the face of further proceedings which substantially alter the parties' relationship. Penick is the law of this Circuit. Thus, even though the majority decides today that appellants' original application was untimely, changed circumstances should compel consideration of appellants' current need to intervene, without reference to the time the suit began.
 
 
 91
 I would reverse the judgment of the District Court and remand for entry of an order granting appellants' motion for leave to intervene.
 
 
 
 *
 Hon. Robert M. Duncan, United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 The adequacy of representation analysis adopted in the dissent appears to be based on Judge Garth's dissenting view in Bolden v. Pennsylvania State Police, 578 F.2d 912, 922 (3d Cir. 1978). In Bolden, the Third Circuit rejected Judge Garth's view, holding that a government entity acts in the public interest and is presumed to adequately represent the interests of non-minorities when it settles an employment discrimination action with a consent decree. Id. at 918
 Today, we hold that the City adequately represented the interests of non-minorities throughout the pre-1980 Decree negotiation process. The City and Plaintiff developed a reasonable consent decree. Therefore, in this case even if the motion to intervene had been filed timely, the proposed intervenors could have done no more than to develop a reasonable consent decree.
 
 
 [2]
 The dissent makes the following assertion: "The majority relies on its earlier conclusion that non-minorities have no interest which could be adversely affected by an affirmative action plan." This is a gross misstatement of the holding in Stotts v. Memphis Fire Fighters, 679 F.2d 541 (6th Cir. 1982). In Stotts, we simply followed an earlier decision of the court which held that a reasonable affirmative action plan does not adversely affect any legally protected interest of non-minorities. See McCall, 633 F.2d at 1238. A reasonable consent decree is a term of art which indicates that the decree has been judicially sanctioned as a reasonable means to correct the effects of past discrimination. Id
 
 
 [3]
 Even assuming the objectives of the parties and not their legally protected interest is the relevant inquiry, the intervenors' motion would still be untimely. The risk that the City would not adequately protect the objectives of some non-minorities was evident from the inception of the litigation. The 1974 Decree indicates a willingness to agree to promotional goals. This foreshadowing indicates that any reliance non-minorities placed in the City to not agree to changes in the promotion procedure within the Fire Department was misplaced. Non-minorities should have attempted to intervene when they first became aware of the action, rather than adopting a "wait-and-see" approach toward the Stotts action. Even had the proposed intervenors attempted to intervene at an earlier date, their consent was not required before the consent decree could be entered. A reasonable consent decree does not adversely affect any legally protected interest of non-minorities. See McCall, 633 F.2d at 1238; Stotts, 679 F.2d 541
 
 
 [4]
 The following statement made in the Dissent is imprecise. "Appellants (the proposed intervenors) cannot vindicate their interest in a separate proceeding because the consent decree is immune from collateral attack." A reasonable consent decree cannot be attacked in a collateral proceeding. However, the court has continuing jurisdiction to modify the decree should its operation become unreasonable in the future. Thus, the proposed intervenors are not absolutely barred from objecting to the 1980 Decree
 
 
 [5]
 The Dissent grossly misstates the facts and holding in Baker v. City of Detroit, 504 F.Supp. 841 (E.D.Mich.1980). The Dissent notes: "Although timeliness was not at issue in Baker, I note that intervention was granted three years after the suit was filed, virtually on the eve of trial." This assertion is patently false and misleading. In Baker, the complaints were filed in November of 1975. Minority police officers filed a motion to intervene in May of 1978. Trial did not begin until nearly three months later in August of 1978. The motion to intervene was not, as the Dissent implicitly suggests, made on the eve of trial. The dissent also states: "Judge Keith commented: (W)ith the wisdom of hindsight ... (p)erhaps the intervenors should have moved to intervene earlier. However, the plaintiffs suffered no prejudice from this. 504 F.Supp. at 849." The quote from page 849 of the Baker opinion not only distorts the expressed meaning of the paragraph, but is itself an inaccurate statement of the language of the opinion. The full paragraph from which the quoted language is taken states as follows:
 As it turned out, the City defendants, at trial, did present extensive evidence of past discrimination. With hindsight it could be argued that the presence of counsel for intervenors was unnecessary. At the same time, counsel for intervenors did an excellent job at trial. Counsel did not interfere with the presentation of either side's case. Counsel protected intervenor's interests, and presented useful additional evidence at trial on the issue of past discrimination. Perhaps the intervenors should have moved to intervene earlier. However, the plaintiffs suffered no prejudice from this.
 A fair reading of the paragraph indicates that a motion to intervene filed three months prior to trial is tardy, but not necessarily untimely. Baker cannot reasonably be construed to support the Dissent's position that a motion to intervene filed two weeks after a consent decree has been preliminarily approved is timely.
 Finally, the dissent quotes as follows: "Had black officers or the U.S. Government filed a suit alleging illegal discrimination on the part of the City of Detroit and seeking affirmative relief, it is likely that such a suit would have (been) settled and a consent decree entered. That consent degree would then have been subject to judicial review, after due opportunity for intervention and/or objection by white officers." This statement was reaffirmed in Stotts v. Memphis Fire Fighters, 679 F.2d 541. In Stotts, we held expressly that "a hearing should be held to enable all individuals who may be affected by the decree to air objections to it." Id. at 551. The proposed intervenors filed a motion to intervene and object to the 1980 Decree. The trial court afforded them a hearing. During the hearing, the basis for the motion to intervene as well as alternatives to the 1980 Decree were discussed. There is evidence in the record that the alternatives suggested by the proposed intervenors were considered and rejected.
 The Dissent also makes much of the fact that the proposed intervenors made hearsay statements that the City agreed to the 1980 Decree at least in part because of the anticipated expenses of trial. One of the advantages of consent decrees is that the expense of trial is avoided. Moreover, the 1974 and 1980 Decrees both state that the desire to avoid the expense of trial was one of the factors which promoted settlement.
 
 
 [1]
 This statement is incorrect. Only nineteen promotions to upper-level management positions in the Fire Prevention Bureau were frozen by the temporary restraining order. The Fire Department consists of nine bureaus, ranging from Communications to Ambulance Services. All eleven applicants belong to the Fire Fighting Bureau. The temporary freeze on promotions applied to the Fire Prevention Bureau only, a comparatively small segment of the Department
 
 
 [2]
 I note that 42 U.S.C. § 2000e-2(a)(2) suggests that promotional opportunities are interests worthy of court recognition and protection. That section proscribes the classification of employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee," based on race, color, or sex, among other criteria. A promotion is an "employment opportunity" within the meaning of this section
 Whatever the precise legal status may be of non-minorities' promotional expectations, they are clearly "interests" adequate for intervention status, and should not be lightly dismissed.
 
 
 [3]
 Compare Nuesse v. Camp, 385 F.2d 694 (D.C.Cir.1967) (burden on opponents to show adequate representation) with Edmondson v. Nebraska ex rel. Meyer, 383 F.2d 123 (8th Cir. 1967) (inadequacy is a necessary element movant must show.)
 
 
 [4]
 I would reject the timeliness test used by the Eighth Circuit in Nevilles v. EEOC, 511 F.2d 303 (1975) (per curiam). I agree with the First Circuit that the Stallworth test with its four factors, is appropriate. Culbreath v. Dukakis, 630 F.2d 15 (1980)
 
 
 [5]
 See 413 U.S. at 366, 93 S.Ct. at 2603. Although NAACP could be read to suggest a different triggering date, that opinion has been described as "sui generis", explicable largely because of the urgency of expediting the case due to an impending primary election, and because of the NAACP's ability to renew its motion at a later time, given the court's continuing jurisdiction over the matter. Jones, supra at 82. Justice Brennan's dissent in NAACP also suggests the limited scope of that decision: "The case plainly turns on its facts, and its impact on the development of principles governing intervention will doubtless be small." 413 U.S. at 373, 93 S.Ct. at 2606 (emphasis added)
 
 
 [6]
 Appeal Nos. 81-5348, 81-5349
 
 
 [7]
 Stotts v. Memphis Fire Department, 679 F.2d 541 (6th Cir. 1982)