657 F.2d 962
 26 Fair Empl.Prac.Cas. 513,
26 Empl. Prac. Dec. P 31,995
Chester W. SETSER, Appellant,
v.
NOVACK INVESTMENT COMPANY, f/k/a Western Trucking Company
and Alvin S. Novack, Appellees.
 No. 80-1100.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 19, 1981.
Decided July 21, 1981.
 
 Michael J. Hoare, argued, Chackes & Hoare, St. Louis, Mo., for appellant.
 H. Kent Munson, argued, Stolar, Heitzmann, Eder, Seigel & Harris, St. Louis, Mo., for appellees.
 Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, STEPHENSON, HENLEY and ARNOLD, Circuit Judges, En Banc.*
 LAY, Chief Judge.
 
 
 1
 We rehear a portion of this case en banc in order to reconsider important questions regarding the permissibility under 42 U.S.C. § 1981 of race-conscious affirmative action plans designed to remedy racial imbalance in a private employer's work force. The en banc court did not review the panel's opinion of January 26, 1981, in respect to parts I and III, Setser v. Novack Investment Co., 638 F.2d 1137, 1139-43, 1146-47 (8th Cir. 1981). Part II, id. at 1143-46, of the original opinion, is ordered vacated and the judgment amended to reflect our en banc holding.
 
 
 2
 On rehearing we address the following issues: (1) whether section 1981 prohibits all race-conscious affirmative action; (2) whether the standards for reviewing affirmative action under title VII govern the review of such plans under section 1981; (3) what are the plaintiff's and defendant's burdens of persuasion and producing evidence in a case where the employer asserts the treatment of plaintiff was pursuant to an affirmative action plan.
 
 
 3
 The Legality of Affirmative Action Programs under Section 1981.
 
 
 4
 In McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Supreme Court held that section 1981 prohibits discrimination against whites, but did not reach the issue of whether the section prohibited all affirmative action. Id. at 281 n.8, 96 S.Ct. at 2579 n.8. Read broadly, McDonald may suggest that all preferential treatment on the basis of race is impermissible.[1] Such a broad reading, however, would be unwarranted in view of subsequent decisions, where seven members of the present Court have sustained affirmative action in other circumstances.[2]
 
 
 5
 Underlying the Civil Rights legislation of the 1860s and 1960s is the judgment that a just and harmonious society requires the eradication of racial discrimination. The progress in eliminating racial barriers in employment has been slow. The eloquent separate opinion of Justice Marshall in University of California Regents v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), chronicles our Nation's record of discrimination. Id. at 387-96, 98 S.Ct. at 2797-2802. Many obstacles to achieving equal employment opportunities remain, as do many traditionally segregated job categories. The Nation's early perception in the school segregation cases taught us these obstacles are unlikely to be overcome merely by the prohibition of present and future discrimination.[3] As Justice Blackmun observed in Bakke, "In order to get beyond racism, we must first take account of race. There is no other way." Id. at 407, 98 S.Ct. at 2807. See also Fullilove v. Klutznick, 448 U.S. 448, 522, 100 S.Ct. 2758, 2797, 65 L.Ed.2d 902 (1980) (Marshall, J., concurring). With regard to title VII, Justice Brennan stated in United Steelworkers v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979):
 
 
 6
 It would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had "been excluded from the American dream for so long," 110 Cong.Rec. 6552 (1964) (remarks of Sen. Humphrey), constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy.
 
 
 7
 Id. at 204, 99 S.Ct. at 2728.
 
 
 8
 It would indeed be more ironic if the Civil Rights Act of 1866 was used now to prohibit the only effective remedy for past discriminatory employment practices against blacks and other minorities, when the Act was virtually useless to prevent the occurrence of such discrimination for more than a century. On this basis, several other federal courts have upheld affirmative action plans against section 1981 challenges since Weber. Local 35 v. City of Hartford, 625 F.2d 416, 425 (2d Cir. 1980); United States v. City of Miami, Florida, 614 F.2d 1322, 1326, rehearing granted, 625 F.2d 1310 (5th Cir. 1980); Detroit Police Officers' Ass'n v. Young, 608 F.2d 671, 691-92 (6th Cir. 1979), cert. denied, --- U.S ----, 101 S.Ct. 3079, 69 L.Ed.2d --- (1980); Baker v. City of Detroit, 483 F.Supp. 930, 980 (E.D.Mich.1979). We conclude that the Supreme Court, by approving race-conscious affirmative action by employers in Weber, implicitly approved the use of race-conscious plans to remedy past discrimination under section 1981. To open the door for such plans under title VII and close it under section 1981 would make little sense. The prohibition under section 1981 of affirmative action plans permissible under title VII would bar a remedy Congress left within the discretion of private employers when it passed title VII. Weber, 443 U.S. at 207, 99 S.Ct. at 2729. Such a result "would augment the powers of the Federal Government and diminish traditional management prerogatives while at the same time impeding attainment of the ultimate statutory goals." Id.
 
 
 9
 The Supreme Court recognized in Weber that defining the standard for determining permissible racially preferential action by private employers is a more difficult task.[4] We are mindful that "(i)n fashioning a substantive body of law under section 1981 the courts should, in an effort to avoid undesirable substantive law conflicts, look to the principles of law created under title VII for direction."[5] This directive is all the more important for determining standards for affirmative action. Divergent standards under the two statutes would render employers unable to remedy some past discriminatory practices, even though the practices were in violation of title VII. Consequently, some effects of employment segregation would be "locked-in." Id. at 215, 99 S.Ct. at 2733 (Blackmun, J., concurring). Moreover, by equating the affirmative action standards of title VII with those of section 1981, we obviate the employer's risk of inconsistent obligations. Private employers already face a dilemma: they risk termination of federal benefits and liability for past discrimination against blacks, for failing to institute an affirmative action plan, and they face liability to whites for any voluntary preferences adopted to remedy past discrimination. If section 1981 prohibited what title VII permitted with respect to racially preferential remedies, the private employer's ability to conform its conduct to federal discrimination statutes would become more complicated and uncertain than it already is.
 
 
 10
 Prima Facie Case of Reverse Discrimination.
 
 
 11
 The proof required to establish a prima facie case of discrimination will necessarily vary in different factual situations. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n.13, 93 S.Ct. 1817, 1824 n.13, 36 L.Ed.2d 668 (1973); Person v. J. S. Alberici Construction Co., 640 F.2d 916, 918 (8th Cir. 1981). "A prima facie case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Weber holds, however, that consideration of race is a permissible factor when that consideration is designed to remedy a "conspicuous racial imbalance in traditionally segregated job categories." 443 U.S. at 209, 99 S.Ct. 2730. Consequently, in a reverse discrimination case, where the evidence shows that plaintiff's treatment by the employer was pursuant to a bona fide affirmative action plan, the satisfaction of the four part McDonnell test will not necessarily show a prima facie violation. This must follow because a race-conscious choice by reason of a remedial affirmative action plan is legitimate under title VII or section 1981.
 
 
 12
 The first burden on the employer in a reverse discrimination suit is to produce some evidence that its affirmative action program was a response to a conspicuous racial imbalance in its work force and is remedial. Some indication that the employer has identified a racial imbalance in its work force is necessary to ensure that new forms of invidious discrimination are not approved in the guise of remedial affirmative action. There is no fixed formula for the type or nature of the evidence sufficient to meet the employer's burden. A showing of a conspicuous racial imbalance by statistics is sufficient, even if the statistics employed would not be sufficient to show a prima facie violation of title VII.[6] Evidence that the employer implemented its plan in response to findings of a racially imbalanced work force by a federal or state agency or in adherence to a court order, whether entered by consent or after contested litigation, would be sufficient to meet the employer's burden of producing some evidence of a remedial purpose. The employer's internal investigation and analysis of its work force which results in a conclusion of a racially imbalanced work force would satisfy the employer's burden. This list of ways to meet the employer's burden of producing some evidence of a remedial purpose is merely suggestive, not exhaustive, of appropriate methods.
 
 
 13
 The second burden on the employer in a reverse discrimination suit is to produce some evidence that its affirmative action plan is reasonably related to the plan's remedial purpose. The goals and timetables for the program should be reasonably related to such considerations as the racial imbalance of the work force, the availability of qualified applicants, and the number of employment opportunities available.[7] Weber tells us that a plan must "not unnecessarily trammel the interests of the white employees." 443 U.S. at 208, 99 S.Ct. at 2730. The specifics of the plan approved in Weber indicate some guidelines for private affirmative action plans.
 
 
 14
 The Weber plan did "not result in the discharge of white workers and their replacement with new black hires." Id. at 208, 99 S.Ct. at 2730. Other courts have also recognized this characteristic as an indicia of a permissible plan. Local 35 v. City of Hartford, 625 F.2d 416, 425 (2d Cir. 1980); United States v. City of Miami, Fla., 614 F.2d 1322, 1339 (5th Cir. 1980); United States v. City of Alexandria, 614 F.2d 1358, 1366 (5th Cir. 1980); McLaughlin v. Great Lakes Dredge & Dock Co., 495 F.Supp. 857 (N.D.Ohio 1980); Baker v. City of Detroit, 483 F.Supp. 930, 983-86 (E.D.Mich.1979); Tangren v. Wackenhut Services, Inc., 480 F.Supp. 539 (D.Nev.1979).
 
 
 15
 Also, the Weber plan did not create "an absolute bar to the advancement of white employees." 443 U.S. at 208, 99 S.Ct. at 2730. In Weber, the plan reserved "for black employees 50% of the openings in an in-plant craft-training program until the percentage of black craftworkers in the plant (was) commensurate with the percentage of blacks in the local labor force." Id. at 197, 99 S.Ct. at 2724. Finally, the Weber plan was characterized as a temporary measure. Id. at 208, 99 S.Ct. at 2730. A plan should be used no longer than reasonably necessary to eliminate a conspicuous racial imbalance.
 
 
 16
 Once an employer has produced evidence that its treatment of the plaintiff was a direct consequence of its implementation of a bona fide affirmative action plan, the employer is entitled to a judgment as a matter of law unless the plaintiff shows that the purpose of the employer's affirmative action program is not remedial. Texas Department of Community Affairs v. Burdine, --- U.S. ----, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981). To raise a genuine issue of material fact, and avoid summary judgment, a plaintiff in a reverse discrimination case must present evidence that would show that (1) some reason other than a remedial reason motivated the employer when implementing the plan or (2) the plan adopted unreasonably exceeds its remedial purpose. One method of raising an issue as to whether the employer's purpose was remedial would be to show that the plan was adopted in the absence of a racial imbalance in the employer's work force. In the absence of evidence which would show that the employer's interest was not remedial or that the plan's goals are unreasonably excessive in light of the plan's remedial purpose, summary judgment is warranted.[8]
 
 
 17
 If the plaintiff presents evidence that the affirmative action plan is unreasonable or irremedial, the court shall weigh the evidence and determine whether the plan is bona fide. The issue of the validity of an affirmative action plan is one for the court and not the jury. There is no bright line distinction between permissible and impermissible affirmative action plans. A flexible evaluation of the particular method adopted is appropriate. Private employers face loss of substantial federal contracts and liability to minorities, if they refuse to initiate affirmative action as a remedy for past discrimination, and they face liability to whites for any voluntary preferences accorded minorities. In light of their dilemma, and out of respect for traditional management prerogatives, 443 U.S. at 207, 99 S.Ct. at 2729, we are reluctant to discourage experimentation by employers in remedying past discrimination. Fullilove, 448 U.S. at 491, 100 S.Ct. at 2781. An employer's plan is a bona fide one if it is reasonably related to its remedial purpose. Fullilove, 448 U.S. at 487, 510, 100 S.Ct. at 2779, 2791; Local 35, 625 F.2d at 423-25; Miami, 614 F.2d at 1338-40; Detroit Police Officers', 608 F.2d at 696.
 
 
 18
 If the court finds the plan has a remedial purpose and reasonable goals, the employer is entitled to summary judgment, unless there is a genuine issue as to whether the treatment of the plaintiff was related to the plan. For example, Setser claims that Novack Investment Co. rejected him on two separate occasions for employment, once in October 1973 and again in November 1973. Setser admits that Novack rejected him in October 1973 because of its affirmative action plan. On remand, if the court finds the plan to be bona fide, Novack is entitled to judgment on the October claim.[9] If the court finds the plan is not bona fide, Novack is still entitled to present any other defense it might have to the jury, including its allegation that Setser was rejected in October as an unreliable employee. The jury shall determine the reason for Setser's rejection. If the jury finds that Setser was rejected in October because of a legitimate, nondiscriminatory reason, Novack is entitled to judgment, regardless whether its plan is bona fide or not.
 
 
 19
 With respect to Setser's claim that he was rejected in November 1973 (1) because of Novack's affirmative action plan or (2) in retaliation for filing an EEOC claim, the roles of the court and the jury follow the same pattern. The court will determine whether the affirmative action plan is bona fide or not. The jury shall determine whether the reason for rejecting Setser was (1) the plan, (2) retaliation, or (3) some legitimate, nondiscriminatory reason. If the court rules the plan is bona fide, Setser is entitled to judgment only if the jury finds that Novack retaliated against him. If the court rules the plan is not bona fide, Novack is entitled to judgment only if the jury finds that some legitimate, nondiscriminatory reason explains Setser's rejection.
 
 
 20
 We remand this case to the district court for consideration of the employer's affirmative action plan in accordance with this opinion.
 
 
 
 *
 Although Judge McMillian did not sit during oral argument, he has participated on the basis of the briefs and approves the opinion
 
 
 [1]
 The Court stated that the statute "proscribe(s) discrimination in the making or enforcement of contracts against, or in favor of, any race." 427 U.S. at 295, 96 S.Ct. at 2586. See also United Steelworkers v. Weber, 443 U.S. 193, 219, 220, 99 S.Ct. 2721, 2735, 2736, 61 L.Ed.2d 480 (1979) (Rehnquist, J., dissenting)
 
 
 [2]
 Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (opinion of Burger, C. J., White and Powell, JJ.; opinion of Powell, J., concurring; opinion of Marshall, Brennan, and Blackmun, JJ., concurring); United Steelworkers v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (opinion of Brennan, Stewart, White, Marshall, and Blackmun, JJ.); University of California Regents v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1980) (opinion of Powell, J., opinion of Brennan, White, Marshall, and Blackmun, JJ.). Justice Rehnquist did not approve affirmative action remedies in any of these three cases; Justices Stevens and Powell did not participate in Weber. Justice Stevens dissented in Fullilove
 
 
 [3]
 In 1977 the United States Commission on Civil Rights observed:
 The short history of affirmative action programs has shown such programs to be promising instruments in obtaining equality of opportunity. Many thousands of people have been afforded opportunities to develop their talents fully opportunities that would not have been available without affirmative action. The emerging cadre of able minority and women lawyers, doctors, construction workers, and office managers is testimony to the fact that when opportunities are provided they will be used to the fullest.
 While the effort often poses hard choices, courts and public agencies have shown themselves to be sensitive to the need to protect the legitimate interests and expectations of white workers and students and the interests of employers and universities in preserving systems based on merit. While all problems have not been resolved, the means are at hand to create employment and education systems that are fair to all people.
 It would be a tragedy if this nation repeated the error that was made a century ago. If we do not lose our nerve and commitment and if we call upon the reservoir of good will that exists in this nation, affirmative action programs will help us to reach the day when our society is truly colorblind and nonsexist because all people will have an equal opportunity to develop their full potential and to share in the effort and the rewards that such development brings.
 United States Comm. on Civil Rights, Statement on Affirmative Action, 12 (1977).
 
 
 [4]
 Whether constitutional standards for affirmative action differ from title VII standards is a question we need not reach in this case. Compare Fullilove, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902, and Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, with Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480. Under both the Constitution and title VII, two questions are of central importance: (1) when is it permissible to initiate an affirmative action plan, and (2) what methods may be employed to prefer one race over another
 
 
 [5]
 Patterson v. American Tobacco Co., 535 F.2d 257, 270 (4th Cir.), cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976), remand aff'd in part, rev'd in part 586 F.2d 300 (4th Cir. 1978), later appeal, 634 F.2d 744 (4th Cir. 1980), pet. for cert. filed 49 U.S.L.W. 3533 (Jan. 16, 1981) (No. 80-1199), quoting Waters v. Wisconsin Steel Works of International Harvester Co., 502 F.2d 1309, 1316 (7th Cir. 1974), cert. denied, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976)
 For the most part, title VII and section 1981 have similar requirements and remedies. Markey v. Tenneco Oil Co., 635 F.2d 497, 498 n.1 (5th Cir. 1981); Whiting v. Jackson State Univ., 616 F.2d 116, 121 (5th Cir. 1980). Section 1981 affords no greater substantive protection than title VII against employment discrimination, New York City Transit Auth. v. Beazer, 440 U.S. 568, 583 n.24, 99 S.Ct. 1355, 1364 n.24, 59 L.Ed.2d 587 (1979), and in some respects may afford less. Compare Guardians Ass'n v. Civil Serv., 633 F.2d 232, 263-68 (2d Cir. 1980) with Davis v. County of Los Angeles, 566 F.2d 1334 (9th Cir. 1977), vacated as moot, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), with regard to the question of whether a showing of disproportionate impact is sufficient to make a prima facie case under section 1981. Bona fide seniority systems appear to receive the same substantive protection under both title VII and section 1981, but the question may be open to some doubt. Compare Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1191 n.37 (5th Cir. 1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); Johnson v. Ryder Truck Lines, Inc., 575 F.2d 471 (4th Cir. 1978), cert. denied, 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1979) with Bolden v. Pennsylvania State Police, 578 F.2d 912, 920-21 (3d Cir. 1978).
 In Person v. J. S. Alberici Constr. Co., 640 F.2d 916 (8th Cir. 1981), a panel of this court recognized that "the principles on the order and allocation of proof (under title VII) ... are applicable to an action brought under 42 U.S.C. § 1981." Id. at 918. Accord Hudson v. International Business Machines Corp., 620 F.2d 351, 354 (2d Cir.), cert. denied, --- U.S. ----, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); Flowers v. Crouch-Walker Corp., 552 F.2d 1277 (7th Cir. 1977); Sabol v. Snyder, 524 F.2d 1009 (10th Cir. 1975); Long v. Ford Motor Co., 496 F.2d 500 (6th Cir. 1974).
 For similar remedies under the two statutes see McCormick v. Attala County Bd. of Ed., 541 F.2d 1094, 1095 (5th Cir. 1976); see generally Johnson v. Railway Express Agy., Inc., 421 U.S. 454, 459-61, 95 S.Ct. 1716, 1719-21, 44 L.Ed.2d 295 (1975); Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 & n.7, 94 S.Ct. 1011, 1019 & n.7, 39 L.Ed.2d 147 (1974).
 The statutes are not identical, however. For example, on the question of the right to a jury when a party seeks back pay under section 1981, the panel's decision in this case distinguishes the practice under title VII. 638 F.2d at 1141-42; Contra Moore v. Sun Oil Co., 636 F.2d 154, 156-57 (6th Cir. 1980).
 
 
 [6]
 "(T)he freedom of an employer to undertake race-conscious affirmative action efforts (does not) depend ( ) on whether or not his effort is motivated by fear of liability under Title VII." 443 U.S. at 208 n.8, 99 S.Ct. at 2730 n.8
 
 
 [7]
 As the EEOC Guidelines set forth:
 (i) The plan should be tailored to solve the problems which were identified in the self analysis, see § 1608.4(a), supra, and to ensure that employment systems operate fairly in the future, while avoiding unnecessary restrictions on opportunities for the workforce as a whole. The race, sex, and national origin conscious provisions of the plan or program should be maintained only so long as is necessary to achieve these objectives.
 (ii) Goals and timetables should be reasonably related to such considerations as the effects of past discrimination, the need for prompt elimination of adverse impact or disparate treatment, the availability of basically qualified or qualifiable applicants, and the number of employment opportunities expected to be available.
 
 
 [29]
 C.F.R. § 1608.4(c)(2)(i) and (ii)
 However, the absence of a written self analysis and a written affirmative action plan or program may make it more difficult to provide credible evidence that the analysis was conducted, and that action was taken pursuant to a plan or program based on the analysis. Therefore, the Commission recommends that such analyses and plans be in writing.
 Id. at § 1608.4(d)(2).
 
 
 [8]
 Our decision is not inconsistent with Parker v. Baltimore & O. R.R., 652 F.2d 1012, 25 F.E.P. Cases 889 (D.C.Cir.1981), wherein the trial court awarded an employer summary judgment on grounds that the employer was implementing an affirmative action program. The Court of Appeals reversed because the affirmative action documents were not part of the record and could not have explained all the employer's promotional decisions in any case. Id. at 892
 
 
 [9]
 Once the court finds the plan to be bona fide under a reverse discrimination claim filed under section 1981 there is nothing further for the jury to pass on. Plaintiff cannot make a claim that his rejection under an affirmative action plan is pretextual since any other alleged reason for his rejection would not be based upon a race-conscious choice and therefore would defeat his claim of racial discrimination under section 1981. Sex and age discrimination claims are not actionable under section 1981. In contrast, under a title VII claim if the plaintiff claims discrimination because of age or sex and the employer asserts as a defense the implementation of an affirmative action plan the issue of a pretextual reason would present an issue of fact for the trier of fact (the court). Cf. Hunter v. St. Louis-San Francisco Ry., 639 F.2d 424 (8th Cir. 1981)