

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-12-1999

# Schurr v Resorts Intl Hotel

Precedential or Non-Precedential:

Docket 98-5356

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Schurr v Resorts Intl Hotel" (1999). *1999 Decisions.* Paper 302.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/302

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 12, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5356

KARL C. SCHURR,

Appellant

v.

RESORTS INTERNATIONAL HOTEL, INC;
NEW JERSEY STATE CASINO CONTROL COMMISSION;
JAMES HURLEY*, CHAIRMAN OF THE NEW JERSEY
STATE CASINO CONTROL COMMISSION

*See Clerk's Order of 12/17/98

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 96-cv-03159)
District Judge: Honorable Stephen M. Orlofsky

Argued
March 11, 1999

Before: MANSMANN, SCIRICA and NYGAARD,
Circuit Judges.

(Filed November 12, 1999)

        Stephen G. Console, Esquire
        Joseph J. Ayella, Esquire (Argued)
        Law Offices of Stephen G. Console
        126 White Horse Pike
        Suite 201
        Haddon Heights, NJ 08035

         COUNSEL FOR APPELLANT

John M. Donnelly, Esquire (Argued)
Levine, Staller, Sklar, Chan,
 Brodsky & Donnelly
3030 Atlantic Avenue
Atlantic City, NJ 08401

 COUNSEL FOR APPELLEE
 RESORTS INTERNATIONAL HOTEL
 CASINO

John R. Zimmerman, Esquire
 (Argued)
Casino Control Commission
Tennessee Avenue and
 the Boardwalk
Arcade Building, 2nd Floor
Atlantic City, NJ 08401-0208

 COUNSEL FOR APPELLEES
 Bradford Smith, Chairman of the
 New Jersey State Casino Control
 Commission and James R. Hurley,
 Chairman of the New Jersey
 Casino Control Commission

OPINION OF THE COURT

MANSMANN, Circuit Judge.

Karl C. Schurr, a light and sound technician in the casino industry in New Jersey, appeals from an order of the District Court granting summary judgment in favor of Resorts International Hotel, Inc., and Bradford Smith, Chairman of the New Jersey Casino Control Commission, in connection with Schurr's claims of reverse discrimination in hiring.[1] In his complaint, Schurr alleged that race was the determining factor in Resorts' decision not to offer him a job which was ultimately filled by an equally well qualified minority candidate. Schurr sought declaratory and injunctive relief against Smith, contending that his

_____

1. James R. Hurley, the current Chairman of the Commission, has been substituted for Smith.

2

Fourteenth Amendment rights were violated by the Commission's regulations establishing minority employment goals. Schurr also alleged that Resorts' affirmative action plan as drafted and applied was invalid, resulting in violation of his rights under Title VII, 42 U.S.C. S 2000e et seq., 42 U.S.C. S 1981, 42 U.S.C. S 1983, the New Jersey Law Against Discrimination, N.J.S. 10:5-1 et seq., and the Fourteenth Amendment to the United States Constitution. Because we are convinced that the District Court erred in granting summary judgment in favor of the defendants on Schurr's Title VII and other statutory claims, we will reverse that portion of the District Court's Order and remand the matter for further proceedings. As to Schurr's Fourteenth Amendment claim against the Commission Chairman, we will affirm the grant of summary judgment in favor of the Chairman on standing grounds, although for reasons different from those set forth by the District Court.

I.

Because this matter, both legally and factually, arises against the regulatory background established by the Casino Control Commission pursuant to the Casino Control Act, N.J.S. 5-12:134, we examine this backgroundfirst. The Casino Control Act requires that every casino license holder undertake affirmative measures to ensure equal employment opportunities. Relevant regulations require that casino licensees take affirmative steps "to ensure that women, minorities and persons with disabilities are recruited and employed at all levels of the operation's work force and treated during employment without regard to their gender, minority status, or disability." N.J.A.C. 19:53-4.3(a). Equal opportunity efforts are to be undertaken in all employment practices including promotion, demotion, layoffs and termination. Id. Casino licensees are required to improve the representation of "[w]omen and minorities in job titles within EEOC job categories in which the casino licensee is below the applicable employment goals established by N.J.A.C. 19-53-4.4." See N.J.A.C. 19:53-4.3(b)(2). The regulations establish the following goals:

| EEOC Job Category | Minority Goal (Percentage) | Female Goal (Percentage) |
|---|---|---|
| Officers and Managers | 25 | 46 |
| Professionals | 25 | 46 |
| Technicians | 25 | 46 |
| Sales workers | 25 | 46 |
| Office and Clerical | 25 | 46 |
| Crafts persons | 14 | 5 |
| Operatives | 25 | 30 |
| Laborers | 25 | 14 |
| Service Workers | 25 | 46 |

N.J.A.C. 19:53-4.4.

In setting these goals, the Commission reviewed 1990 census data for Atlantic City, New Jersey and for the Commission's casino industry work force composition analysis. See 25 N.J.R. 3690 (August 15, 1993). The goals for each category were "based on the actual number of employees in the comparative work force who were actually available to fill such positions," and were set so as not to exceed the cumulative Atlantic County work force statistics in the given category. Id. In addition,"if the Atlantic County availability statistic falls significantly (more than ten percent) below the cumulative Atlantic County work force statistic for that class, the employment goal for that particular EEOC category and class will be the Atlantic County availability statistic." Id.

In order to meet these goals and as a prerequisite to licensing, each casino licensee is required to develop an Equal Employment and Business Opportunity Plan ("EEBOP"). N.J.A.C. 19:53-6.1. The EEBOP must set forth a detailed description of "the means by which the[casino] intends to comply with the equal opportunity and regulatory obligations imposed by N.J.A.C. 19:53-4.4." N.J.A.C. 19:53-6.4. While the regulations do not specify the means which must be used to meet employment goals, the terms of the EEBOP are subject to the approval of the Commission.

By statute, the Commission is also charged with monitoring the composition of the workforce at each

4

licensed casino. Each licensee is required to file quarterly and annual reports with the Commission and the Division of Gaming Enforcement on its "affirmative action efforts . . . concerning [its] operations work force." N.J.A.C. 19:53-4.5, 4.6. The quarterly report must include a listing of the operations workforce by race and gender in each EEOC job category and subclass. Id. Each casino is also required to supply a summary of new hires, promotions, terminations, and layoffs, a copy of all grievance reports relating to equal employment opportunity, and a report on the implementation of upward mobility training programs and the status of participants. Id. If in a given quarter the "casino licensee is below the applicable . . . goal established by the N.J.A.C. 19:53-4.4 for a job category in which a position with a salary of $35,000 or more is filled by someone other than a woman or minority, the casino licensee [must] document its efforts to hire or promote a woman or minority to the position." N.J.A. 19:53-4.5(c)(2). Similarly, "each casino licensee whose annual workforce composition report does not demonstrate that the casino licensee or applicant achieved the applicable employment goals . . . shall be required to document its efforts to implement and comply with the operations workforce section of its EEBOP. . . ." N.J.A.C. 19:53-4.6.

Casino licensees are also subject to periodic EEBOP assessment hearings at which the licensee is required to demonstrate its compliance with its equal opportunity and affirmative action obligations. If the Commissionfinds that the licensee has failed to meet performance goals, the licensee must document its good faith efforts to achieve these goals, showing that it has implemented and complied with those portions of its approved EEBOP which relate to achievement of performance goals. N.J.A.C. 19-53-6.8. Should the Commission determine that a casino licensee has failed to comply with the requirements of the Act, it may impose sanctions. Id. These penalties include, among others, denial, suspension, revocation of, or refusal to renew the casino license, the imposition of license conditions, referral of a matter for legal action, assessment of civil penalties, and "other action authorized or permitted by the Act." N.J.A.C. 19:53-6.11.

5

II.

With the legislative and regulatory background established, we turn to the facts. In July 1994 Karl Schurr, a white male resident of New Jersey, sought a position as a light and sound technician at Resorts in Atlantic City, New Jersey. Schurr had worked at Resorts in a number of full-time jobs from 1974 until 1986 when he resigned in order to enter the restaurant business. After June 1986 Schurr continued to work for Resorts on occasion as a "casual" worker[2] on an "as needed" basis.

In late 1993 a full-time light and sound technician at Resorts was suspended. While arbitration proceedings relevant to this suspension were pending, Schurr, still working as a casual employee, filled in for the suspended employee on a regular basis. In early July 1994, the labor arbitration was concluded and the full-time technician's job became available. Five people, including Schurr, applied for the job.[3] Bill Stevenson, Resorts' Director of Show Operations and Stage Manager, narrowed those under consideration to Schurr and Ronald Boykin, a black male who was also employed as a casual worker at Resorts. Both Stevenson and his direct superior, Robert Chambers, believed that each of the applicants was qualified for the open position. Stevenson viewed the two as equally qualified. Acting pursuant to what he believed was required by the Resorts EEBOP, Stevenson hired Boykin. Stevenson stated that under the EEBOP, the "technician" classification was underutilized as of October, 1993, i.e., the percentage of minorities in the technician category was 22.25%, but the goal established by the Casino Control Commission regulations was 25%. Stevenson stated that he

---------------------------------------------------------------

2. A casual employee is defined in the union contract between Resorts and the International Alliance of Theatrical State Employees as "an employee required to supplement specific classification in the normal house crew on an intermittent basis."

3. At about the same time, Schurr also applied to Resorts for a position as an apprentice mechanic. Schurr's complaint alleged reverse discrimination in Resorts' failure to hire him for this position as well. The District Court found that Schurr failed to establish a prima facie case with respect to this position. Schurr does not appeal that portion of the District Court's ruling.

believed that in an underutilized category, for which there were two equally qualified applicants, he was obligated to hire the minority applicant. Chambers, Stevenson's superior, also believed that Resorts was obligated to hire the minority candidate if one of the two qualified applicants for a position was a minority and Resorts had failed to meet state goals in the relevant category.

After learning that he had not been hired for the full-time technician position, Schurr continued to work as a casual employee at Resorts and at other Atlantic City casinos.4 In January 1995 Schurr filed a charge of discrimination with the New Jersey Division of Civil Rights and the EEOC alleging discrimination on the basis of race. He received a notice of right to sue on May 7, 1996, and on July 8, 1996, Schurr filed this action.

On January 13, 1997 the parties consented to dismissal with prejudice of all of Schurr's claims against the Commission, and to dismissal of the section 1983 claim for monetary damages against the Commission Chairman.

Following the close of discovery, the parties filed motions for summary judgment. In an order dated June 30, 1998, the District Court entered an order granting the motions filed by Resorts and the Commission Chairman and denying the motion filed by Schurr. This timely appeal followed.5

_____

4. In January 1996, Schurr became a full-time employee of another Atlantic City resort. He continues to work at casinos as a casual employee for extra income.

5. The District Court had jurisdiction pursuant to 28 U.S.C. S 1331. We have jurisdiction pursuant to 28 U.S.C. S 1291. Our review of an order granting or denying a motion for summary judgment is plenary. Johnson v. Horn, 150 F.3d 276 (3d Cir. 1998). We apply the same test as that used by the District Court. We must be satisfied that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All inferences are to be drawn in favor of the non-moving party. Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997).

III.

We address first whether Schurr has standing to assert claims against the Commission Chairman for declaratory and injunctive relief. Schurr contends that his Fourteenth Amendment equal protection rights were violated when the Commission Chairman enforced the Commission's regulations setting minority employment goals and requiring that casino licensees implement affirmative action plans designed to meet these goals: "Smith and the Commission's actions in imposing employment goals in Resorts' [EEBOP] and in approving and monitoring same, directly resulted in Resorts' denial of the Light and Sound Technician . . . position to Schurr." The District Court granted summary judgment in favor of the Commission Chairman, concluding that Schurr lacked standing to pursue his claim.

The standing requirements embodied in the "case" or "controversy" provision of Article III of the United States Constitution mandate that in every case, the plaintiff be able to demonstrate:

> An "injury in fact"-- an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; second, [that] there [is] a causal connection between the injury and the conduct complained of -- the injury has to be "fairly trace[able] to the challenged action of the defendant, and not .. . the result [of] the independent action of some third party not before the court." Third, [that] it [is] "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations omitted). Applying these standing requirements to the facts of this case, the District Court concluded, first, that Schurr did not suffer an "injury in fact" within the meaning of Article III. In Northeastern Florida Chapter of the Associated Gen. Contractors of America v. City of Jacksonville, 508 U.S. 656, 666 (1993), the Supreme Court determined that "the `injury in fact' in an equal protection case of this variety is the denial of

8

equal treatment resulting from the imposition of[a] barrier . . . ." Relying on this language, the District Court concluded that the challenged regulations constituted merely a means of "outreach" to minorities and women, and did not constitute a barrier to others:

> The Commission's affirmative action regulations in general, and the minority and women employment goals in particular [did] not erect a barrier to Schurr's ability to compete fairly for the positions for which he applied . . . . [T]he Commission's regulations mandate that casino licensees reach out to women and minority candidates, not that they prefer women and minorities in actually making hiring decisions. Because Schurr applied, and was seriously considered for the light and sound technician job, he was not injured by Resorts' failure to reach out to him . . . .
>
> [T]he obvious thrust of the regulations is that . . . a casino licensee should broaden the pool of applicants, not that casino licensees should prefer minorities and women to non-minorities and men in making hiring decisions.
>
> [N]o hiring preference appears on the face of or is implied by the language of the regulations . . . .

Schurr v. Resorts Int'l Hotel, Inc., 16 F. Supp. 2d 537, 548-49 (D.N.J. 1998). The District Court reasoned that because the regulations merely required casino licensees to "broaden the applicant pool by employing various outreach efforts," they had not injured Schurr. Id. at 549.

The District Court also concluded that Schurr lacked standing to maintain his claim against the Commission Chairman because he failed to show a causal link between the relevant regulations and Resorts' decision to hire the minority candidate. "[T]here is only the most attenuated relationship between the Commission's regulations and the hiring decisions which allegedly injured or will injure Schurr." Id. at 550. In the District Court's view, the regulations at issue did not mandate a particular employment decision:

> [W]ith respect to the decision not to hire Schurr for the light and sound technician job, Schurr's damage is

9

fairly traceable only to Resorts' actions in implementing its affirmative action plan and Resorts' actions in administering the plan through its employees.... Schurr's damage is not, however, traceable as far back as the Commission's regulations.

Id. The Court concluded that:

The "links in the chain" between the Commission's regulations and Schurr's alleged injury are "far too weak as a whole to sustain" Schurr's standing. Accordingly, I will grant Smith's Motion for Summary Judgment and deny Schurr's Motion for Summary Judgment on his section 1983 claim.

Id. (internal citation omitted.)

The District Court's standing analysis as to both injury in fact and causation rested on its characterization of the Commission's regulations: "[These] regulations specifically do not authorize or encourage the use of preference in hiring. Instead they specifically provide for other, much more benign methods by which casino licensees may expand the applicant pool." Id. at 549-50. According to the District Court, "even the most casual review of the Commission's regulations" reveals that "the obvious thrust of the regulations is that, in order to improve the representation of women and minorities . . . a casino licensee should broaden the pool of applicants . . .." Id. at 549.

We disagree with the District Court's characterization of the regulations. Our reading of both the Act and the implementing regulations convinces us that the regulatory scheme challenged here contemplates something beyond "benign methods by which casino licensees may expand the applicant pool." Id. at 550. The finding that the challenged regulations are directed only at recruitment is inconsistent with the language used in the regulations.

The regulations were drafted to prohibit discrimination by "encouraging businesses to achieve a balanced representation of employees at all levels of the work force," N.J.A.C. 15:32-1.1, and to ensure that "affirmative efforts are made to recruit and employ" minorities, N.J.A.C. 19:53-

10

1.4 (emphasis added). Affirmative efforts are to address, without limitation, all employment practices including:

> (1) employment promotion, demotion or transfer;

> (2) recruitment, recruitment advertising or postin g;

> (3) layoff or termination;

> (4) rates of pay and other forms of compensation o r benefits;

> (5) selection for training and upward mobility programs; and;

> (6) grievance procedures for, and disposition of, complaints related to equal employment opportunity.
> . . .

N.J.A.C. 19.53-4.3. If a casino licensee fails to meet the established goal, the licensee is required to document its good faith efforts to hire a qualified female or minority candidate for the position. N.J.A.C. 19:53-4.3.

The broad language used throughout the regulations as a whole undermines both the District Court's conclusion that the scheme is addressed to recruitment alone and its disposition of the standing issue on the basis of that conclusion. We agree with the District Court that the regulations do not mandate specific hiring decisions. We are convinced, however, that in setting employment goals for women and minorities, in monitoring compliance with these goals, and in providing for sanctions if casino licensees cannot demonstrate good faith efforts to comply with those goals, the regulations were intended to influence employment decisions generally and may, as here, affect concrete decisions; for example, which of two equally qualified job candidates will be hired.

This conclusion is supported by the testimony of the Resort employees responsible for hiring under the EEBOP. They testified that they believed that the regulations and the EEBOP formulated and reviewed pursuant to those regulations required that they hire the minority candidate over Schurr. Given the candidates' comparable qualifications, those responsible for hiring at Resorts were unable to justify hiring Schurr where the technician job

11

category was underutilized. Furthermore, they did not want to bear the administrative burden of having to do so. This evidence supports the conclusion that the regulations set employment goals, and place administrative pressure upon casino licensees to meet these goals. The fact that the regulations do not explicitly require minority hiring or mandate a race-based decision is not dispositive of the causation question.

Although it was decided under a somewhat different set of facts, our causation analysis is guided by the discussion set forth by our sister Court of Appeals for the Ninth Circuit in Bras v. California Public Utilities, 59 F.3d 869 (9th Cir. 1995), cert. denied, 516 U.S. 1084 (1996). In Bras, the court considered an equal protection challenge to a California statute, the California Women and Minority Business Enterprise Law, which required nongovernmental contractors to meet minority participation goals. Pursuant to this law, the California Public Utilities Commission was directed to formulate goals for state utilities in the procurement of goods and services from minority-owned businesses. In 1988, the Commission promulgated an order requiring each state utility to establish a "goal" specifying that it would purchase at least fifteen percent of its utilities requirements from minority firms.

In response to this Order, in 1991, Pacific Bell provided a prequalification form to a number of architectural firms from which it expected to receive proposals for future work. This form required the firms to specify whether they were certified as a minority or women enterprise. Bras submitted its form, stating that it was not so certified. Because it was not a minority enterprise, Bras was not selected as one of the firms eligible to bid on Pacific Bell projects.

Bras filed suit in federal court alleging that the Law and the Order violated the requirements of the Equal Protection Clause. Bras also sought a permanent injunction preventing the Commission from implementing the goals provided for in the Law and the Order. The district court dismissed Bras' claim for lack of standing.

On appeal, a majority of the Court held that Bras had satisfied the standing requirements and should have been

12

permitted to pursue the request for injunctive relief.6 The Court found that although the challenged Law and Order set "goals" and not set-asides, they had the practical effect of placing the Bras firm on unequal footing in competing for business. According to the Court of Appeals, the"economic reality" created by both the Law and the Order was the requirement that California utilities adopt discriminatory programs, or risk sanction. As a result, the Court held that there was a connection between Bras' injury and implementation of the Law and Order sufficient to satisfy the causation element of the standing analysis.

We do not find any meaningful distinction between the goals at issue in Bras and those challenged here. The challenged goal-based regulations, like those at issue in Bras, clearly have the practical effect of encouraging (if not outright compelling) discriminatory hiring.

That employment goals may, in some circumstances, create a classification based on race was also recognized by the Court of Appeals for the District of Columbia Circuit in Lutheran Church-Missouri Synod v. FCC, 141 F.3d 344 (D.C. Cir.), reh'g denied, 154 F.3d 487 (D.C. Cir.), and reh'g en banc denied, 154 F.3d 494 (D.C. Cir. 1998). There the Court addressed the impact of the FCC's regulatory

_____

6. The Bras court determined that the question of standing was controlled by the Supreme Court's holding in Northeastern Florida Chapter of the Associated Gen. Contractors v. City of Jacksonville, 508 U.S. 656, 666 (1993), and that the "injury in fact" associated with minority preference programs is "the inability to compete on an equal footing in the bidding process, not the loss of a contract." Bras, 59 F.3d at 873. The court concluded that Bras satisfied this "injury in fact" requirement by stating that he wanted to "reinstate" his eligibility to bid on Pacific Bell projects "in the future" and that he was "ready, willing and able" to provide services to Pacific Bell. Id. at 873-74. Tracking this language, Schurr here asserts that he is "ready, willing and able" to work at Resorts. As discussed infra, this allegation does not itself resolve the issue of whether Schurr has established a sufficiently imminent injury to be entitled to forward-looking relief. That issue is governed by Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211 (1995), a decision that issued shortly after and was therefore not addressed in Bras. Moreover, unlike the situation in Bras, the evidence in this case indicates that Schurr has in fact been repeatedly subject to the challenged regulations, without apparent adverse consequence.

requirement that radio stations adopt affirmative action programs incorporating numerical goals, based on population data, for hiring women and minorities. In determining that goals similar to those at issue here created minority preferences subject to equal protection analysis, the Court of Appeals noted that the crucial point is not whether the regulations required quotas, but rather whether they obliged stations to grant some degree of preference to minorities in hiring. Concluding that the challenged regulations granted such a preference, the court explained:

> The entire scheme is built on the notion that stations should aspire to a workforce that attains, or at least approaches, proportional representation. . . . The very term "under-representation" necessarily implies that if such a situation exists, the station is falling short of the desired outcome. The regulations pressure stations to maintain a workforce that mirrors the racial breakdown of their "metropolitan statistical area."

> . . .

> Although it was urged that . . . "goals" should be treated differently than obligatory set asides . . . we do not think it matters whether a government hiring program imposes hard quotas, soft quotas, or goals. Any one of these techniques induces an employer to hire with an eye toward meeting the numerical target. As such, they can and surely will result in individuals being granted a privilege because of their race.

Lutheran Church-Missouri Synod v. FCC, 141 F.3d 351-52, 354.

However, our conclusion that the District Court erred both in characterizing the regulations at issue and in holding that Schurr failed to establish causation does not mandate reversal, for there is another component of the standing inquiry that is at issue.

Schurr's sole equal protection claim against the Commission Chairman is for forward-looking declaratory and injunctive relief. In order to have standing to challenge future rather than past application of the regulation,

14

Schurr must allege that the setting of minority employment goals for job categories within the casino industry "in the future constitutes `an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.' " Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211 (1995) (quoting Lujan v. Defenders of Wildlife, 504 U.S. at 560). Under this standard, Schurr must demonstrate that he will in the future be prevented from competing on an equal basis with minority candidates; i.e., Schurr must show that the employment goals embodied in the challenged regulations will cause "imminent" injury. The District Court held that Schurr failed to do so. Schurr, 16 F. Supp. 2d at 551. We agree.

Schurr's evidence in support of his claim that he is in danger of imminent injury in fact supports the opposite conclusion. For example, Schurr testified at his deposition that since January 1996, he has held a full-time position as an engineer at another casino. The engineering position appears to be one covered by the challenged regulations (under either the "professional" or "technician" category). Schurr also testified that in addition to this full-time work, he has obtained part-time casino work -- at Resorts as well as at least five other casinos -- "filling in" for extra money. The part-time work appears to be that of a technician. This evidence indicates that since being denied the full-time technician's job in 1994, Schurr repeatedly has been subjected to the regulations, with no apparent adverse effect.

In evaluating Schurr's evidence of imminent harm, we are also mindful of what is not in the record. There is no evidence of how frequently jobs for which Schurr is qualified become available.7 There is no evidence of how frequently Schurr must compete with women or minorities for those jobs. There is no evidence as of whether Schurr has been denied any other job for which he applied-- or

_____

7. Such evidence is of obvious important to the imminence issue. For example, Schurr testified at this deposition that he rarely works at "the Sands" merely because "they don't do much." The challenged regulations thus played no part in Schurr's inability to work at the Sands.

15

the reason for such denial. Nor is there any evidence of whether any of the other casinos at which Schurr might apply have met their relevant goals, or whether they, like Resorts, consider the "goals" to mandate hiring preferences. This record is therefore distinguishable from that in Adarand, which supported a finding that Adarand had established a threat of "imminent injury" necessary to maintain its claim for forward-looking relief. The evidence in Adarand included statistical evidence of how frequently the relevant contracts came up for bid; evidence that Adarand bid on every such contract in Colorado, and was "very likely" to bid on future contracts; and evidence that Adarand "often" had to compete against businesses certified under the challenged program. Adarand, 515 U.S. at 212. We also note the statement in Lujan that " `some day' intentions" are insufficient to establish an imminent injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 564 (1992).

In sum, Schurr failed to make an adequate showing that he is in danger of suffering imminent injury as a result of the challenged regulations. Accordingly, we will affirm the order of the District Court granting summary judgment in favor of the Commission Chairman, limited in accordance with our foregoing discussion.

IV.

We focus next on Schurr's claim that Resorts violated the requirements of Title VII when it made race a factor in the decision not to hire Schurr.

Because the District Court, after extensive analysis, rejected Schurr's equal protection claim for lack of standing,8 it conducted only a cursory Title VII analysis.9 Generally,

_____

8. Our decision with respect to Schurr's standing to pursue forward-looking relief on his equal protection claim applies as well to any claim for forward-looking relief under Title VII or the related statutes that Schurr asserts.

9. For example, the District Court concluded the Commission's affirmative action regulations were enacted to remedy a manifest imbalance because it found the regulations set forth "employment goals on a category by category basis" and "distinguishe[d] between skilled and unskilled workers." But under Weber, a court determines whether a manifest imbalance existed by examining the racial makeup of the labor force.

16

courts of appeals should not decide the legality of an affirmative action program in the absence of careful district court analysis of the merits. In most cases, a district court's analysis of why an affirmative action plan was adopted and how the plan affects non-minorities is crucial to thorough and effective appellate review of the plan. See Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 277-78 (1986) (plurality opinion) (stating that in the absence of district court's analysis an "appellate court reviewing a challenge by nonminority employees to remedial action cannot determine whether the race-based action is justified as a remedy for prior discrimination"); In re Birmingham Reverse Discrimination Employment Litig., 20 F.3d 1525, 1539-40 (11th Cir. 1994) (stating that district court findings of fact are "necessary" to appellate review and that in their absence "appellate court has no basis upon which to determine whether race-based action was justified as a remedy"); Conlin v. Blanchard, 890 F.2d 811, 815 (6th Cir. 1989) (refusing to decide legality of affirmative action program because, inter alia, district court did not make findings of fact regarding past discrimination). In most cases, therefore, the better course is to remand and instruct the district court to conduct this analysis. But this is an atypical case; here, the record on summary judgment makes clear that Resorts' plan was not adopted to remedy a manifest imbalance in traditionally segregated job categories. Accordingly, based on that record, we will assess whether Resorts' plan violates Title VII.

The terms of Title VII are violated when an employer takes action "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or "to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect his status as an employee" on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. S 2000e - 2(a). Although this language was initially construed as absolute -- prohibiting all discrimination in employment, see e.g. Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616, 643 (1987)-- it is clear now that in certain circumstances, race-based employment

17

decisions made pursuant to an affirmative action plan do not run afoul of the statute.

We considered affirmative action efforts in the context of a Title VII action in Taxman v. Board of Educ., 91 F.3d 1547 (3d Cir. 1996), cert. dismissed, 118 S.Ct. 595 (1997). There, we cited the Supreme Court's decision in United Steelworkers v. Weber, 443 U.S. 193, 208 (1979), that: "Title VII's prohibition against racial discrimination is not violated by affirmative action plans which, first, `have purposes that mirror those of the statute' and second, `do not unnecessarily trammel the interests of the [non-minority] employees.' " 91 F.3d at 1550. 10

In order to determine the purpose underlying Title VII, we analyzed Supreme Court precedent in light of the plain language of Title VII, and concluded that:

> Title VII was enacted to further two primary goals: to end discrimination on the basis of race, color, religion, sex or national origin, thereby guaranteeing equal opportunity in the workplace, and to remedy the segregation and under-representation of minorities that discrimination has caused in our nation's workforce.

Id. at 1556. We placed particular emphasis on the remedial component of Title VII, finding it central to the Title VII scheme:

> The significance of [the] second corrective purpose cannot be overstated. It is only because Title VII was written to eradicate not only discrimination per se but the consequences of prior discrimination as well, that racial preferences in the form of affirmative action can co-exist with the Act's antidiscrimination mandate.

Id. We then announced the following rule which now guides our discussion of Schurr's Title VII claim and Resorts' affirmative action plan: "Unless an affirmative action plan has a remedial purpose, it cannot be said to mirror the purposes of the statute, and, therefore, cannot satisfy the first prong of the Weber test." Id.

_____

10. This two-prong test announced in Weber was reaffirmed in Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616 (1987).

18

The parties in this matter agree that Schurr has established a prima facie case of race-based employment discrimination11 and that Resorts rested its decision not to hire Schurr on the terms of its affirmative action policy. Here, then, as was the case in Taxman, "The dispositive liability issue ... is the validity of [Resorts'] policy under Title VII." Id.

We have carefully reviewed the record in this matter and are convinced that the affirmative action plan offered to rebut Schurr's prima facie case lacks the remedial purpose required by controlling precedent. In order to be characterized accurately as remedial, an affirmative action plan must be designed to correct a "manifest imbalance in traditionally segregated job categories." Weber, 443 U.S. at 207. "The requirement that `manifest imbalance' relate to a traditionally segregated job category `provides assurance . . . that race will be taken into account in a manner consistent with Title VII's purpose of eliminating the effects of employment discrimination . . . ." Johnson, 480 U.S. 650 (emphasis added).

Under our reasonable interpretation of this standard, Resorts' affirmative action plan is deficient. The plan itself and the regulations which mandate the plan were not based on any finding of historical or then-current discrimination in the casino industry or in the technician job category; the plan was not put in place as a result of any manifest imbalance or in response to a finding that any relevant job category was or ever had been affected by segregation.12 Indeed, the case now before us is an unusual

_____

11. We analyze Schurr's Title VII claim under the approach set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973). When a plaintiff establishes a prima facie case, the burden of production shifts to the employer to show a legitimate nondiscriminatory reason for the decision. The decision in Johnson, 480 U.S. at 626, establishes that one such reason may be an affirmative action plan. If the employer is able to meet this burden of production, the burden shifts back to the employee to demonstrate that the nondiscriminatory reason offered is pretextual, i.e. that the affirmative action plan is invalid.

12. Evidence that a manifest imbalance existed either before or after Resorts enacted its plan would have sufficed. See Wygant v. Jackson Bd.

19

one in that there is no disagreement as to whether Resorts' plan or the challenged regulations were intended to remedy past or present discrimination. They were not. In a deposition, Gustave Thomas, the designated Commission representative, testified as follows:

> Q: Now prior to issuing the employment goals in the Commission's regs, did the Commission itself ever practice discrimination?
>
> Thomas: No, not to my knowledge.
>
> Q: Was there ever any finding that the state had discriminated with regard to the various job categories and the employment goals pursuant to those categories issued by the Commission regs?
>
> A: Not to my knowledge.
>
> Q: The casinos, from the inception of the casino industry in Atlantic City, have always needed to have the employment goals pursuant to those categories issued by the Commission rep?
>
> A: That's correct.

The remainder of the record contains nothing to suggest that the Act or the regulations promulgated pursuant to that Act were drafted or enacted with an intent to remedy any discrimination. The Commission does not contend otherwise. On appeal, the Commission makes the following statement relevant to the purpose underlying the Act and the regulations:

_____

of Educ., 476 U.S. 267, 291 (1986) (O'Connor, J., concurring); Contractors Ass'n of Eastern Penna., Inc. v. City of Philadelphia, 6 F.3d 990, 1004 (3d Cir. 1993) (admitting post-enactment evidence); see also Coral Constr. Co. v. King County, 941 F.2d 910, 921 (9th Cir. 1991) (explaining that refusing to admit post-enactment evidence places municipalities in the "dilemma of deciding whether to wait the months necessary for further development of the record, risking . . . culpability [to Blacks] due to inaction, or to act and risk liability [to Whites] for acting prematurely but otherwise justifiably.")

> The Legislature recognized that a once renowned
> tourist area had become blighted and had been largely
> abandoned by tourists. The Legislature was also aware
> Atlantic City had and has a large minority population,
> and sought to ensure that the job creation which
> would accompany casino developments would benefit
> all segments of the population.

This absence of any reference to or showing of past or present discrimination in the casino industry is fatal. The affirmative action plan relied on by Resorts in this Title VII action is invalid under the first prong of Weber13 and "cannot form the basis for deviating from the antidiscrimination mandate of Title VII." Taxman, 91 F.3d at 1563. Schurr, therefore, is entitled to summary judgment on the Title VII claim.

V.

Our disposition of Schurr's Title VII claim dictates reversal of the District Court's grant of summary judgment in favor of Resorts on Schurr's claims based on the NJLAD and on section 1981.

Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim. We predicted in Taxman that the New Jersey Supreme Court considering an affirmative action plan in light of the NJLAD "would follow the analytical directive of Weber and Johnson." 91 F.3d at 1564. The result under the NJLAD would, therefore, be the same as that reached in our Title VII analysis. Schurr is entitled to summary judgment on his claim made under the NJLAD.

The result is similar with respect to Schurr's claim based on 42 U.S.C. S 1981. While a valid affirmative action plan serves as a defense to an action under section 1981, the standard for evaluating the validity of a plan is identical to the standard developed in Title VII cases. Setser v. Novack

_____

13. Because we conclude that Resorts' plan fails the first part of the Weber test, we do not address whether the plan passes the second part of that test; i.e., whether it "unnecessarily trammel[s] the interests of [non-minority] employees." Weber, 443 U.S. at 207–08.

21

Investment Co., 657 F.2d 962, 968 (8th Cir. 1981). In light of our conclusion that the Resorts' affirmative action plan was invalid for purposes of Title VII, we also conclude that the plan cannot serve as a defense to Schurr's section 1981 claim. The grant of summary judgment in favor of Resorts on this claim was, therefore, inappropriate. As the District Court recognized, "In the Third Circuit, the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim." Schurr, 16 F. Supp.2d at 556. Schurr was entitled to summary judgment under Title VII and should have been granted summary judgment on the section 1981 claim as well.

Because the District Court granted summary judgment in favor of the defendants on the Title VII and related statutory claims, it did not, of course, consider the question of damages. Based on our holding in this matter, an assessment of damages is required. As the record is understandably devoid of evidence bearing on this assessment, we will remand this matter to the District Court for further proceedings.

VI.

We find that the District Court properly granted summary judgment in favor of the Commission Chairman on Schurr's equal protection claim and will, therefore, affirm the Order of the District Court with respect to that claim. We find that the District Court erred in granting summary judgment in favor of Resorts on claims made pursuant to Title VII, Section 1981, and the NJLAD, and will direct that summary judgment be entered in favor of Schurr on these claims. This matter will be remanded to the District Court for consideration of damages under Title VII and the related statutes.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

22